THE AURORA AND GENEVA RAILWAY COMPANY

v.

JENNIE D. HARVEY et al.

Opinion filed February 17, 1899—Rehearing denied April 6, 1899.

1. PRACTICE—power of trial court to permit amendments upon reversal without remanding. When a cause is reversed and remanded with directions to proceed in conformity with the accompanying opinion, and it appears from such opinion that the grounds of reversal are such as may be obviated by amendment of the pleadings or the introduction of additional evidence, the trial court should allow the amendments and admit the evidence as on first hearing.

2. SAME—it is only where merits of case are settled that court may not permit amendments. It is only where the merits of the controversy and the ultimate rights of the parties are decided in a court of review that a reversal and remandment will deprive the trial court of the right to allow amendments and hear additional evidence.

3. EMINENT DOMAIN—construction of word "necessary," used in Horse and Dummy Railroads act. The word "necessary," used in the Horse and Dummy Railroads act of 1874, (Rev. Stat. 1874, p. 571,) with reference to the right of a street railway company to condemn private property "for the construction, maintenance or operation" of the road, does not mean "absolutely necessary," but "expedient," "reasonably convenient" or "useful to the public."

4. SAME—when street railway company may leave highway. To avoid a dangerous grade crossing with a steam railroad, or a dangerously steep grade terminating at the bottom in a sharp curve, a street railway company may leave the highway and condemn a right of way around such obstacles over private property, in order to conserve the safety, comfort and convenience of the public.

MAGRUDER, J., dissenting.

APPEAL from the Circuit Court of Kane county; the Hon. GEORGE W. BROWN, Judge, presiding.

This is an appeal from the decision of the circuit court of Kane county in a proceeding under the act in regard to horse and dummy railroads of this State, instituted by appellant, against appellees, to condemn the real estate described in its petition. The parties interested in this appeal have been before this court at a former term, (see

*Harvey* v. *Aurora and Geneva Railway Co.* 174 Ill. 295,) and as two of the disputed questions now presented grow out of the construction and effect to be given to our opinion rendered in that case, it will be proper to briefly re-state the facts and proceedings then before us:

"The Aurora and Geneva Railway Company, appellant, was organized under the general Incorporation law of the State, entitled 'An act concerning corporations,' approved April 18, 1872. In the application to become incorporated the purposes for which the corporation was organized are stated as follows: 'The object for which it is formed is to build, construct, maintain and operate street railways, horse and dummy railroads and tramways in the county of Kane, in the State of Illinois, to be operated by electricity or by any other motive power excepting steam, for the purpose of carrying passengers, express matter, mail and baggage; also for the purpose of generating and supplying others with electricity, in any form, for power, heat, light and for any other purpose.'

"The certificate of organization bears date July 29, 1896, and the purpose of the corporation was to construct a street railroad from Aurora to Geneva, the county seat of Kane county. Soon after the organization of the company, it constructed an electric street railway over certain public streets in Aurora and along the public highway from Aurora to Batavia, which was about two-thirds of the distance from Aurora to Geneva. On the 8th day of September, 1896, appellant petitioned the board of supervisors of Kane county to grant to it, and to its successors and assigns, for the period of twenty years, the right to lay down, construct, maintain and operate during said time its railway and tracks, with necessary sidings, appurtenances, poles, wires and other equipments, for the purpose of operating its railway and carrying out the purposes of its incorporation in, upon and along that part of the public highway in the townships of Batavia and Geneva, in said Kane county, Illinois, which runs

along the westerly bank of Fox river, extending from a point on said highway connecting with Batavia avenue, at the northerly city limits of the city of Batavia, to the southerly city limits of the city of Geneva. The board of supervisors, after due consideration, granted the prayer of the petition. From the northern limits of the city of Batavia the railway company proceeded to construct its street railway along the highway, the use of which was thus granted to it by the supervisors of Kane county for the distance of about one-quarter of a mile, to a point less than one thousand feet south of where the right of way of the Chicago and Northwestern Railway Company crosses the said highway. At this point the managers of the road determined to deflect from the highway, pass under the Northwestern railway and construct the road over private property from the point indicated to near the terminus of the road,—a distance of over one mile. Under this arrangement the managers undertook to leave the highway altogether and run over private property along the banks of Fox river, which lies at a distance east of Batavia avenue varying from eight hundred to fifteen hundred feet.

"The railway company, not being able to procure land for right of way from the owners, filed a petition in the circuit court of Kane county to condemn a strip fifty feet in width and about a mile and a half in length over private property, claiming the right to do so under 'An act in regard to horse and dummy railroads' (Rev. Stat. chap. 66,) and the Eminent Domain act. (Rev. Stat. chap. 47.) Appellees, land owners, appeared, and entered a motion, supported by affidavits, to dismiss the petition filed against them. The motion was predicated on the ground that unlimited power was not conferred on railway companies incorporated under the general Incorporation act as horse or dummy railroads, but that the power of condemnation which is given by the Horse and Dummy act is purely ancillary and incidental to the

proper purposes of a street railway. Thus it was contended that the power given to condemn might properly be exercised by a street railway when it became necessary to take private property in order to render the use of the highway practicable and efficient,—when, for example, power houses, switches or turn-outs demanded such use, or when some practically insurmountable obstacle necessitated a slight deflection from and return to such highway,—but that it could not be exercised for the purpose of enabling a street railway to cease to be a street railway; that it could not, in other words, be exercised to enable the road to leave the highway over which it had the privilege of going, between two points a mile and a quarter apart, and to make for that mile and a quarter an exclusive right of way for itself over the private estates of individuals. On the other hand, the petitioning railway company asserted that right, and claimed that power was given to it by the Horse and Dummy act to select its route over private property and condemn the lands so selected. The court denied the motion to dismiss the petition."

Appellees excepted, and prepared a bill of exceptions containing the motion and affidavits in its support, which was signed and sealed by the court. Cross-petitions were then filed by appellees, and on a hearing before the court and a jury damages were awarded for the lands taken, and appellees sued out the writ of error upon the hearing of which the opinion above referred to was rendered. The question then presented for our decision was whether this appellant (then defendant in error) had the right, by virtue of the provisions of the act in regard to horse and dummy railroads, to exercise the same right of eminent domain as is permitted to railroad companies organized under the Railroad act. In the following language we held that the right of eminent domain conferred by the Horse and Dummy Railroad act is a limited and not a general right, as was contended by petitioner:

"It is clear that section 2 of the act of 1874 confers power upon a street or horse and dummy railroad company to take private property, but the power is a limited one, as is apparent from the language of the section. It declares: 'When it is necessary for the construction, maintenance or operation of such road, or the necessary sidings, side-tracks or appurtenances, to take or damage private property, the same may be done.' Giving this language a strict construction, which, under the uniform decisions of this court, must be done, can it be said that defendant in error was at liberty, in the construction of its road, whenever it saw proper, to leave the highway upon which it was authorized by the board of supervisors of Kane county to construct its road, and take private property against the will of the owner? We think not. If, in the construction of the road in the highway, difficulties or obstructions were encountered which rendered it impracticable to construct the road in the highway, a necessity might arise, within the meaning of the law, which would authorize the company to leave the highway and go upon private property until the difficulty encountered was overcome, when a return could be made to the highway; or if sufficient land could not be had in the street for side-tracks, turn-outs or stations, and the same were necessary for a successful operation of the road, under the statute the company would have the right to resort to private property. The power conferred by section 2 of the act is not general. It is limited to a case where it becomes necessary to resort to private property, and that necessity must be shown in the petition to condemn. What is said in 119 N.Y. *supra*, applies here: 'Section 13 of the act of 1850 allows any corporation organized thereunder to obtain by condemnation such land as is 'required for the purposes of its incorporation.' The power is not general or unlimited. The company cannot condemn what it pleases, but only such and so much land as

the proper execution of its corporate purposes shall require and render necessary.' Here no reason whatever was shown by the petitioner for leaving the highway, nor was any evidence introduced on the hearing of the motion to dismiss, showing a necessity for leaving the highway and resorting to private property."

Whether, under this construction of the statute and the facts of the case as they might appear, the company would be entitled to condemn the property taken was there neither considered nor decided. The opinion concluded in these words: "For the error indicated the judgment will be reversed and the cause remanded." The remanding order issued from the clerk's office contained the language, "for further proceedings in conformity with this opinion."

The original petition for condemnation alleged, in general terms, that for the construction and maintenance of its railroad it would be necessary for the petitioner to enter upon and appropriate the private property therein described, following substantially the form usually adopted by railroads in condemnation proceedings. Upon the re-instatement of the cause in the circuit court after its reversal and remandment by this court, appellant asked and obtained leave to file amendments to its petition, setting out the facts which it claims constitute the necessity for taking the private property in question. Appellees moved to dismiss the petition as amended, averring that by the opinion and mandate of this court filed in the cause the circuit court was required to dismiss the petition, and that by the opinion and mandate the petitioner was precluded from amending its petition and the court from receiving any amendment thereto, and averring further that the facts alleged did not show any necessity for the proposed condemnation. In support of their motion and contention they filed eighteen affidavits from civil engineers and others. In opposition thereto appellant filed affidavits by twenty-seven civil

engineers and several others, to the effect that the proposed route necessitating the condemnation is the only safe, feasible and practicable one.   These affidavits are all the evidence offered by either party on the hearing and determination of the motion to dismiss, and thereupon the court ordered that the petition be dismissed at the petitioner's cost.  From that order the appellant now prosecutes this appeal.

A. J. HOPKINS, F. H. THATCHER, and F. A. DOLPH, for appellant.

EDWARD O. BROWN, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

This appeal presents three questions:  First, were amendments to the petition properly allowed on the re-instatement of the cause, after the reversal and remandment by this court; second, what interpretation is to be given to the word "necessary," in the Horse and Dummy Railroad act; and third, has such necessity been shown as will warrant the condemnation of the property in question.

*First*—It is strenuously insisted on behalf of appellees that the circuit court erred in permitting appellant to amend its petition on the re-instatement of the case after its reversal and remandment by this court.   The rule is well settled that when a decree is reversed and the cause is remanded without specific directions the judgment of the court below is entirely abrogated and the cause then stands in the court below precisely as if no trial had occurred, and the lower court has the same power over the record as it had before its judgment or decree was rendered, and may permit amendments to the pleadings and the introduction of further evidence, so long as the same are not inconsistent with the principles announced in the court of review and do not introduce grounds that did not

exist at the hearing in the court below. (*Palmer* v. *Woods*, 149 Ill. 146; *Chickering* v. *Failes*, 29 id. 294; *Perry* v. *Burton*, 126 id. 599; *Cable* v. *Ellis*, 120 id. 136; *Rush* v. *Rush*, 170 id. 623.) And further, it is well understood that when a cause is reversed and remanded with direction to proceed in conformity to the opinion then filed, and it appears from the opinion that the grounds of reversal are of a character to be obviated by subsequent amendment of the pleadings or the introduction of additional evidence, it is the duty of the trial court to permit the cause to be re-docketed and then to permit amendments to be made and evidence to be introduced on the hearing, just as though it was then being heard for the first time. (*Washburn & Moen Manf. Co.* v. *Wire Fence Co.* 119 Ill. 30; *West* v. *Douglas*, 145 id. 164.) In the opinion heretofore filed the only point in fact decided is, that the petition for condemnation should have stated facts showing the necessity for appropriating the lands in question. This defect was easily cured by amendment, and the circuit court committed no error in allowing the amendment. In fact, it was the duty of that court to permit the amendment and to admit evidence in proof of the facts alleged in the amended petition. It is only when the merits of the controversy and the ultimate rights of the parties are decided in a court of review that a reversal and remandment will deprive the court below of the right to allow amendments to the pleadings and hear other evidence, and the authorities cited by counsel for appellees go no farther than this.

*Second*—Counsel for appellees contends that the "necessity" required by the statute in relation to horse and dummy railroads, means an "absolute necessity,"—a necessity so great that in the case at bar, if it is physically possible for appellant to construct and maintain its railroad upon the highway there is no right to condemn. We do not think such a strict interpretation should be placed upon the language of the statute. In the former opinion herein referred to we said: "If, in the construction of the

road in the highway, difficulties or obstructions were encountered which rendered it *impracticable* to construct the road in the highway, a *necessity* might arise, within the meaning of the law, which would authorize the company to leave the highway and go upon private property." And again: "In the construction of the road, if a necessity existed for making a deflection from the highway in order to avoid a heavy grade which would prevent a successful operation of the road, defendant in error would no doubt have the right to take and condemn private property to obviate the difficulty." The safety, comfort and convenience of the traveling public require protection, and the policy of the State must be to compel railroad companies to so build their roads as to conserve the safety of its citizens to as high a degree as is reasonably attainable in view of the character and exigencies of that mode of transportation. In the construction of statutes relating to the taking of private property the word "necessary" should be construed to mean "expedient," "reasonably convenient" or "useful to the public," and cannot be limited to an absolute physical necessity. This, we think, was certainly the intention of the legislature when the act was passed. The view here expressed seems to be well supported by the authorities. *Hays* v. *Briggs*, 3 Pitts. 504; *Comrs. of Parks* v. *Moesta*, 51 N.W. Rep. 903; *Pettingill* v. *Porter*, 8 Allen, 1; *Coates* v. *Mayor of New York*, 7 Cow. 585.

*Third*—Keeping in mind the character of the necessity which must be shown to warrant the condemnation of private property by a corporation of this character, has any such necessity been shown to exist here? The evidence adduced on the hearing of the motion to dismiss the petition in the form of affidavits is very voluminous. The following facts are, we think, clearly proved by the petitioner and substantially admitted by appellees:

The Aurora branch of the Chicago and Northwestern railway crosses the public highway onto private ground at an acute angle on a four per cent curve, and on a grade

of sixty-eight to seventy feet to the mile; that the elevation of the outer rail over the inner one, measured in the line of the highway, is five inches; that the railway company runs trains over and across this public highway at a high rate of speed at intervals of not to exceed thirty minutes, from six o'clock in the morning until late at night, on each and every day; that from a point on the south side of said crossing it is extremely difficult to see a train coming from the north until it is practically crossing the public highway; that immediately north of this branch crossing of the Chicago and Northwestern, and between it and the main tracks of that company in Geneva, is a hill that rises to the height of forty feet above the level of appellant's road; that commencing a few feet north of the branch crossing of the Northwestern railway the hill rises at a gradient of four feet to the hundred feet for a distance of between eight hundred and twelve hundred feet, and then, after a number of sharp undulations, reaches the crest of the hill, and then descends the same at a grade of five per cent to the hundred feet for a distance varying from eight hundred to a thousand feet; that the foot of the hill is in a hollow made by a ravine which crosses the public highway at this point and extends to the left of the highway in a northwesterly direction for a long distance, and the Chicago and Northwestern main tracks cross this low depression, made by the ravine, a distance several hundred feet west of the highway in question; that to the right of the highway, at the foot of the hill, the ravine extends in a southeasterly direction to Fox river; that this depression is only a few hundred feet in width, and the public highway begins to rise at gradients of five or six per cent to the hundred feet until it reaches the center of the main tracks or yards of the Chicago and Northwestern railway at this point,— a distance of probably eight hundred feet from the point where appellant in its proposed route crosses the public highway from Fargo's ground onto the premises of ap-

pellee Pope; that over the five per cent eight hundred or
one thousand foot grade, on the hill above mentioned,
there is a heavy foliage, and that at certain seasons of
the year the dropping of leaves upon the track would se-
riously interfere with the operation of a car on the same
and would render it dangerous to passengers riding on
such car; that this grade upon this part of the hill is
made even more dangerous by the character of the mac-
adam, which, under the traffic, becomes a fine powder,
and when moistened by the rain becomes an oily paste on
the rails, which would greatly increase the difficulty of
controlling the car; that there are seven main and side-
tracks of the Chicago and Northwestern railway that
cross the public highway at the top of the second eleva-
tion, which is reached by a grade of from five to six per
cent from the low depression of ground last above men-
tioned; that the yards of the Chicago and Northwestern
railway are over and across the public highway at this
last mentioned point, and that freight and passenger
trains pass and re-pass this public highway over said
tracks at intervals of every ten or fifteen minutes on
each and every day, and that at this point there is much
making and unmaking of trains crossing the highway;
that the yards of the company are unusually wide, and
for the electric road to cross them it would have to cross
practically the center of the yards over the highway at
this point, and would have to cross these seven railroad
tracks, with the conditions of making and unmaking of
trains and passing and re-passing of freight and passen-
ger trains at frequent intervals, as above indicated; that
the route proposed by appellant in its amended petition
avoids the crossing of the Aurora branch of the Chicago
and Northwestern railway by a subway already con-
structed by appellant; that it avoids the obstacles and
dangers of ascending and descending the hill above men-
tioned, between the Aurora branch and the main tracks
of the Northwestern, by skirting around the foot of the

hill next to Fox river on almost a perfect level, and, on reaching the public highway, following the ravine up from Fox river; that it extends to the left of the highway and follows the low land made by the ravine over Fargo's property, and escapes the dangers of the grade crossing of the seven main tracks of the Chicago and Northwestern railway by a subway, which appellant proposes to construct at the west extremity of the passenger depot of the Chicago and Northwestern, and then, by easy grades, connects with its Geneva end of the road already constructed to the court house.

In support of their motion to dismiss, appellees filed affidavits of twelve persons, experts in the location, construction and operation of electric railroads such as the appellant is building, only four of whom, however, were familiar with the premises described in the petition. Of these four, the affidavit of William P. Harvey, one of the appellees, his wife being the real party interested, will be quoted at length, as being at least as favorable to the contention of appellees as any of their witnesses. It is as follows:

"I, William P. Harvey, of Geneva, Kane county, Illinois, being duly sworn, on my oath say that I am by profession a civil engineer, and was actively engaged in work as such from the year 1886 until the year 1895, and during the last five years of that period my work was in the construction and operation of electric railroads. I have made a survey of Batavia avenue at and near the point where the right of way of the Aurora branch of the Chicago and Northwestern Railroad Company crosses it, a little north of the point where the proposed route of the petitioner in this proceeding coming northward would leave said highway; and I have also surveyed said Batavia avenue at and near the point within the city limits of Geneva where the proposed route of the petitioner herein would emerge from private grounds and cross said highway. I have also carefully examined, without the

necessity of a formal survey, the said avenue between
the two points at which I made formal surveys as afore-
said. The construction of the petitioner's line in the high-
way, and crossing the Aurora branch of the Chicago and
Northwestern railroad aforesaid at grade and up the hill
immediately to the north of that crossing, would involve
a gradient to be surmounted of not to exceed three and
one-half feet in a hundred, or what is known to engi-
neers as a three and one-half per cent gradient. If it
should be considered necessary or desirable to go under
the track of the Chicago and Northwestern railroad, this
could be done without leaving the highway and without
exceeding a four per cent gradient of a total length of
about one thousand feet. If it should be found neces-
sary, for any unforeseen reason, to leave the highway for
the purpose of going under the track of the Chicago and
Northwestern railroad, it would be possible for the line of
said petitioner to follow its present contemplated route
from where it leaves the highway to the north-east side
of the Chicago and Northwestern railroad right of way,
from which point it would be possible to return to the
said highway, intersecting the east line of the same at a
point about three hundred and ten feet north of the cen-
ter of the Chicago and Northwestern track and continu-
ing on up the before mentioned hill without exceeding
a three and one-half per cent gradient of a total length
of about twelve hundred feet. My survey at this point
was specially intended to determine what such gradients
would be. The construction of the petitioner's line along
the highway between the southern city limits of Geneva
and the northern end of said highway, which end is at the
fork of the roads just south of the main right of way of
the Chicago and Northwestern Railway Company, would
involve the surmounting of a gradient not greater than
five and one-half per cent and about one thousand feet
in length, as the highway is at present graded, which
percentage, with a little alteration of the road, could be

easily reduced to five per cent.  This I determined also by actual survey.  The highway in the space between the two surveys made by me as aforesaid has none but trifling undulations, none of which would present the difficulty of a grade as great as either of these concerning which I have specially commented in this affidavit."

The other three engineers who examined the premises make substantially the same statements, except that they estimate some of the grades a little higher.  The remaining eight affiants on behalf of the appellees confine their statements to the question of the safety and practicability of steep grades, and state that grades of four, five, six, seven, and even as high as eight, per cent are not objectionable and constitute no serious obstacles to the successful operation of an electric railroad, and are not such serious elements of danger as to be worthy of consideration.  On the question of grade crossings of electric and steam railways, five of the twelve witnesses concur in the statement that such crossings are always undesirable and ought to be avoided if possible.  Two or three witnesses also say, in a general way, that such crossings can be made safe by a system of interlocking switches.

In opposition to the motion to dismiss the petition appellant filed affidavits of twenty-seven civil and electrical engineers who have had varying experiences extending from seven to forty years,—all men of experience in the location, construction and operation of electric railroads. As is the case with the affidavits offered by appellee, they can neither be set out nor specifically noticed within the reasonable scope of an opinion, nor would any good purpose be served by attempting to do so.  That of William A. Lynch, whose connection with electric railroads appears to have commenced with their introduction and continued to the present, and who seems to be disinterested and impartial, covers all the questions involved in this branch of the case.  After stating his experience with electric railroads he says:

"My attention was first called to the electric railway between Aurora and Geneva three or four years since, and I made an examination of the line, not only between those points, but between Geneva and Elgin, with a view to becoming interested financially in the enterprise, but as nothing was done at the time I did not become interested in the road and have no present interest in it. In going over the line I followed the highway between the points named and made such lateral examinations of the country as suggested themselves to me as I passed along the highway. My attention has been invited to the location of this railway lately, and I have made a somewhat careful examination, so far as seems to be involved in this controversy, at the city of Geneva, and extending my observation thence south, first along the highway and then along the line of the company's proposed location over private property. I have also examined the plan and profiles in this case as prepared by the company's engineer. These plans show the plan of the country, with profiles showing the present surface lines both upon the highway and upon the company's location over private property.

"The first question involved in the location is, naturally, the proper exit from Geneva southward. I understand the important point to be reached in Geneva is the court house, and I find that the company has already located and constructed its line beginning at the court house, running on Campbell avenue to Sixth street and thence on Sixth street to South street. Taking this line as the fixed position in Geneva I endeavored to ascertain the most suitable exit from the city to the south. After doing that I somewhat widened my inquiry without having in mind the fixed position in Geneva by the railway as actually constructed, and in that connection my attention was called to two suggested lines of outlet, which are the only two lines that it seemed possible could be considered other than the company's proposed line of

exit. Of these two lines proposed the first is upon Third street, which involves crossing over the tracks of the Chicago and Northwestern railway very close to its depot at Geneva, and, in fact, involves the crossing of its yards, which are occupied by the main tracks and the side-tracks, necessarily much used for switching, making up of trains, station service, etc. There are, as I remember, seven tracks at this street crossing. This line would involve a grade crossing over these tracks. No one who notes the frequent and almost constant use of these tracks can fail to see that a crossing of an electric railway over them would be highly dangerous. As against any other line which could be obtained at any reasonable increase of cost, I have no hesitation in saying that this grade crossing is highly inadmissible, and in my opinion there is no manner in which that crossing could be rendered safe and practicable.

"My attention has been called to affidavits in this case on behalf of the property owners, and noted statements therein that an electric railway crossing at this point could be made safe by the employment of devices, —among others, interlocking switches. I am familiar with all forms of interlocking devices in use upon steam and electric railways,—at least I have examined a great many,—and I can say that I do not know of any interlocking device that could be employed at this point that would make this a safe and practicable grade crossing. I know that interlocking devices are used at steam railroad crossings, and can be so constructed and operated as to very much diminish the dangers attendant at such crossings,—in fact, practically prevent them. They can be so constructed at steam crossings as to render it physically impossible for two trains on different railroads to reach or to occupy the crossing at the same time. But that is not the case with any interlocking device in use where electric railways cross steam roads. At such crossings the practice is to lock the electric road against the

crossing and to give the steam road the right of way, so to speak.   At this crossing it will be seen that it would be impossible to construct interlocking switches which would prevent the engines and trains of the Chicago and Northwestern railway from reaching and occupying this crossing at the same time with an electric car.   I do not mean that it would be physically, but that it would be practically, impossible.  The introduction of interlocking switches at this point would deprive the railway of the use of its yards, and would cause no end of inconvenience and annoyance in the use of its passenger and freight station.   It would be possible to put in interlocking devices so that the electric car would not reach the crossing unless and until some one had gone upon the steam railway track or across it, which is the common method, and there operated a device which would permit the electric car to pass upon or over the crossing.  This plan has frequently been used so as to insure a man going from the electric car upon and across the steam railroad, being a precaution that the operators of the car are obliged to take in order to get across, and in a very considerable degree lessens the danger at such crossing, but it cannot be said that this would render the crossing absolutely safe.   On the contrary, there are elements of danger in connection with the crossing of electric cars over steam railroads which even this precaution does not lessen.   It is a well known fact that the operation of electric cars requires the transmission of current from some central station, and it is equally well known that the interruption of this current is of frequent occurrence, and takes place constantly from any one of a thousand causes which cannot be wholly prevented, and absolutely without warning or notice to those operating the car.  It is absolutely instantaneous, and when it takes place the operators of the car are absolutely without power to propel it.   This fact introduces or constitutes an element of great danger, and as a steam road always claims and exercises, and

must claim and exercise, the right of way over a cross-
ing, and does not assume and cannot assume to guard
itself or the electric railroad against a danger of this
character, the electric car is subject to this danger. This
danger of the interruption of the current is increased by
a number of tracks, and from the time that is taken in
going over the crossing of so many tracks from the first
track to the last track.

"There is another danger of some considerable moment
which exists from the fact that the crossings of electric
railways with steam railroads are apt to be and are some-
what rough,—that is, the car experiences a considerable
shaking up, no matter how well constructed; and it is a
matter of common observation that in cases where elec-
tric cars pass along rough track the trolley is more apt
to get off the wire than where the track is smooth, and
hence we frequently see that at railroad crossings trol-
leys do leave the wire, thereby depriving the car of its
means of propulsion. This can be prevented, or at least
mitigated, by extra care at these points, but the danger
cannot be entirely avoided.

"After considering the whole matter of this crossing
I desire to express the opinion that I consider it a very
unsafe one, and the road should not be constructed there-
on if other possible line can be obtained.

"The other means of exit called to my attention is by
way of First street, under the tracks of the Chicago and
Northwestern railway, and thence by Bridge street to
the highway leading south of the city. If I understand
the situation correctly, this is the only exit from the city
to the south available for public travel, except Third
street across the seven tracks of the Northwestern, to
which I have above referred, making this one of the most
important highways, inasmuch as it provides the only
route from the city south for the general public. To
place an electric railway in this street through this sub-
way under the Northwestern tracks would be to impose

a burden upon the traveling public and upon the citizens
of Geneva which should not be permitted if there is any
possible way to avoid it.   This under-crossing is not a
straight one.   On the contrary, a pretty sharp curve oc-
curs in the highway just at that point and extends to the
south, where the street swings around into the public
highway.  The abutments at the subway cut off the view
both ways,—that is, the view of a person traveling on the
road going south and approaching the subway would be
cut off as against an electric car approaching the sub-
way from the south, and *vice versa.*  I would regard the
construction of an electric railway along First street,
through the subway and along Bridge street, as a very
serious burden upon the traveling public along the street.

"Leaving the whole question of the exit of the rail-
way from Geneva, I am of the opinion that the location
selected by the company is the only proper one and the
only feasible and practicable one, having in view the suc-
cessful operation of the railway, and especially having
in view the rights of the traveling public either upon the
cars of the company or upon the street.

"There is another railroad crossing a short distance
south of Geneva where the highway passes over what is
known as the Aurora branch of the Chicago and North-
western.   It is a single track road, which I observed to
be in constant use by trains.  This crossing is especially
dangerous because of the fact that trains approaching
the crossing from the west round a sharp curve which
cuts off the view, and a person standing at the crossing
or near it cannot see approaching trains from that direc-
tion.   I observed at that point there is a heavy grade
upon the steam road, which would be an additional ele-
ment of danger.   While I do not consider this crossing
nearly so dangerous as the one in Geneva, I consider it
highly objectionable, and if any other way is possible
I would say that it ought to be selected, even though it
should involve considerable extra cost to the railway.

In fact, I may say that while grade crossings are used and are obliged to be used in cities, and to some extent in the country, past experience shows that the dangers attendant upon such crossings should be avoided wherever it is possible to do so. In cities ordinarily it is not possible, and the danger must be met as well as can be by the employment of care in the use of such crossings; yet we know that it is impossible to expect the employment of care always and under all circumstances, and whatever may be said theoretically about such crossings, we know that practically they are very dangerous.

"Looking over so much of this location, beginning at Geneva and going southward, as seems to be involved in this present inquiry, I do not wish to be understood as saying that the grade crossing of the seven tracks at Geneva and the grade crossing of the Aurora branch of the Northwestern alone necessitate the deflection of the location from the highway, but coming now to that portion of the highway lying between those two points the questions involved in the location are very plain. The location in the highway involves the use of a grade of five feet to the hundred, or thereabouts, for some seven hundred feet, and if the grade crossing were to be avoided and the Bridge street line is also to be avoided, as in my opinion they should be, it further involves the introduction of a curve, with a radius of from one hundred and twenty-five feet to one hundred and fifty feet, just at the foot of this grade. After going over the highway and looking into the matter carefully, I am of the opinion that the only feasible and practicable route between these two points is the one selected by the company. Grades of five per cent are in frequent use upon electric railways. I am operating a railway with heavier grades than that, but their use is very dangerous, especially under certain conditions of the track, generally dependent upon the state of the weather. A grade of that kind, in and of itself, is a very objectionable part of an electric

railway. No system of brakes has yet been introduced which will absolutely prevent a car from sliding upon such a grade. While this sliding often happens without causing injury, yet it is liable to result in serious injury, and frequently does so. But with the introduction of a sharp curve at the bottom of such a grade the danger is greatly increased. If a car should get beyond control on such a grade, (as might often happen and does often happen owing to the failure of the brakes to act, or, in acting, their failure to hold the car, and owing to the failure of the current and inability to reverse the car, or, even if all should work properly, the car, under certain conditions, might easily, and often.does, slide,) it would leave the track at the curve. The surface of the ground at this point is broken by a ravine, and the sliding of a car down that grade and its leaving the curve would doubtless precipitate it into the ravine and cause serious accident. It seems to me that the location of this grade, with a curve at the foot, under the conditions existing at this point, makes that location inadmissible.

"I have examined the two proposed locations,—the one proposed by the railway company over private grounds, avoiding the two railway crossings, and the other along the highway,—and looking at the question, considering the effect upon the owners of private property, and also with reference to the convenience and safety of the public using the highway and the convenience and safety of the public using the electric railway, I have come to the conclusion that the line proposed by the railway over private property is the only proper and practicable location from these different points of view. The gradients are excellent. No sharp curves are involved. It will be entirely safe and free from avoidable danger."

The statements made by this witness are fully and repeatedly corroborated in the affidavits of the other twenty-six witnesses for appellant, half of whom, at least, have made actual inspection of the premises and the

others have familiarized themselves with the location by examination of the map and profile in evidence, the correctness of which is not disputed. On the question of excessive gradients and grade crossings of electric and steam railroads the witnesses on behalf of appellant are unanimous in their condemnation of both when they can possibly be avoided, and the evidence as to the dangerous character of grade crossings is corroborated by five of the witnesses for appellees. The evidence of expert witnesses is always more or less argumentative,—perhaps more so when, as in this case, it is given in the form of *ex parte* affidavits; but from the facts stated and the opinions given by all the witnesses it is impossible to escape the conclusion that by the clear preponderance of the evidence such a necessity for the condemnation of private property by street car companies as is contemplated by the statute has been established by the petitioner in this cause.

The point is made by counsel for appellees that even if a necessity for the departure from the highway has been shown, it does not appear that a return thereto can not be made, and thereby the condemnation of at least a part of the land in question be avoided. With the legal ground of the proposition we fully agree. That is to say, if under our construction of the statute a necessity for departing from public streets or roads arises in the construction of street railways, a return to the public highway must be made as soon as the same can be practicably done. The facts in this case, however, show that a return to the highway was impracticable, and we are unable to agree with counsel in the contention that the evidence fails to show that a return to the public highway, after leaving it, could not reasonably be made.

We are of the opinion that under the evidence in this case the petitioner below, appellant here, established its right, under the law, to condemn the property sought to be taken, as described in its petition, and that the circuit

court erred in its judgment denying it that relief. That judgment will accordingly be reversed and the cause will again be remanded, with directions to proceed in conformity with the views herein expressed.

*Reversed and remanded.*

Mr. JUSTICE MAGRUDER: I dissent from this opinion *in toto,*—both the reasoning of the opinion and the conclusion reached by it.