ELI BROOKS, Appellee, *vs.* THE CHICAGO, WILMINGTON
AND VERMILION COAL COMPANY, Appellant.

*Opinion filed April 23, 1908—Rehearing denied June 5, 1908.*

1. MINES—*when a miner was rightfully at place of injury.* A mule driver who has been ordered to take a mule and empty car and clean up coal at a certain entry, and who, when the car is full, has need of another empty to finish the work, may rightfully attempt to put the loaded car on the nearest track where loads are stored, in the absence of any direction with respect to that matter or of any custom or usage in that regard.

2. PLEADING—*word "necessary" may mean "expedient."* An allegation in a declaration by a miner in a personal injury suit that it "became necessary for plaintiff, in the performance of his duty, to place a certain car loaded with coal upon the side-track," is supported by proof that it was convenient and tended to greatly facilitate the performance of his duty to place the car on such side-track, even though it was not absolutely necessary.

3. EVIDENCE—*what statement is a conclusion, only.* A statement, in an affidavit for continuance, that it was not the duty of the plaintiff to do a certain thing, but, on the contrary, it was his duty not to do so, is but a conclusion, and proof in the form of such statement would not be admissible in evidence in an action by the plaintiff for damages for an injury received while doing such work.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

PATTON & PATTON, (GEORGE C. MASTIN, of counsel,) for appellant.

SHUTT, GRAHAM & GRAHAM, and JAMES H. MURPHY, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

The appellee was so seriously injured in appellant's coal mine April 3, 1905, that his right leg was required to be amputated above the knee. He also claims to have sustained other injuries. He brought a suit against appellant for damages on account of said injuries and secured a verdict and judgment in the circuit court for $5000, which have been affirmed by the Appellate Court, and appellant prosecutes a further appeal to this court.

At the time of his injury appellee was engaged, and had been for three months previous, in driving a mule at night in moving machinery, cleaning up entries, hauling timbers, and generally doing anything he was directed to do by the use of a mule and car. The declaration consists of two counts. As originally drawn the first count charged that there was in use by appellant in its mine a certain switch track controlled by a switch lever; that said switch lever and apparatus connected with it were dangerous and unfit for use, (particularly describing its operation and wherein it was alleged to be dangerous.) The declaration avers that while in the performance of his duty it became necessary for appellee, and he was directed by appellant, to place a car loaded with coal upon a track connected with said dangerous switch; that there were cars loaded with coal standing upon said track, and that to place the car he was hauling on the track with the loaded cars he was required to pass over said dangerous switch, to do which he was required to adjust the switch track so as to throw the car he was hauling upon the track where loaded cars were placed; that the appellee properly adjusted the switch track lever, and apparatus connected therewith, to enable him to do this; that his duty had not theretofore brought him to that part of the mine and he had never had occasion to use or manipu-

late the switch track lever and appliances and did not know
and had not been informed of their dangerous condition.
The declaration further avers that after adjusting the switch
track lever and apparatus, and while appellee was driving
forward the mule hauling the loaded car to place the car
upon the load-track, by reason of its dangerous and im-
proper construction and condition the switch lever fell in
such manner as to cause the car appellee was hauling to
be thrown upon the track used for placing empty cars in-
stead of the track for loaded cars, thereby causing the car
to run upon and against appellee and crush him between
said car and other cars standing on the switch track. The
additional count is substantially the same as the original, ex-
cept that it charges the switch was broken and out of repair.

At the conclusion of all the evidence appellant moved the
court to direct a verdict in its favor, on the ground there
was no proof tending to show appellee was ordered or di-
rected to take the car to the place where he was injured.
Thereupon appellee asked and obtained leave to amend the
declaration, and amended it by striking out of each count
the allegation that he was directed to take the car to said
place where he was injured. Appellant then entered a mo-
tion for a continuance and presented an affidavit in support
of its motion, but upon appellee agreeing to admit as evi-
dence the parts of the matter set up in said affidavit held by
the court to be competent, the motion for a continuance was
overruled. Appellant again presented its motion for a per-
emptory instruction, which was denied and the cause sub-
mitted to the jury.

The evidence shows that from the bottom of the shaft
of appellant's mine the main entry, known as "main" or
"straight south," led south a considerable distance. At a
point variously estimated at from fourteen hundred to two
thousand feet from the bottom of the shaft an entry led to
the west from this main entry, called "third west" or "third
right." In the third west was a track leading to the straight

south entry and there connecting with a track which ran to the bottom of the shaft, upon which cars were hauled to and from said shaft. In the third west entry, and about one hundred and fifty feet from the straight south, another track branched off the main track and ran alongside of it back toward the face of the coal. The main or south track was used for storing loaded cars until they were ready to be hauled to the shaft, and the switch or north track was used for storing empty cars until they were ready to be used by the miners. The hauling was done, both of empty and loaded cars to and from the shaft, by an electric motor. When a load of empty cars was hauled back into the third west entry, the practice was to throw them in on the north or switch track by a flying switch. To do this required that the switch lever be operated very quickly, and a boy was kept at the switch for that purpose. The switch, with the apparatus to operate it, was so designed as to facilitate its being quickly shifted when these flying switches were made. When the lever that operated the switch lay flat on the ground the switch points were set for running cars in on the empty track. To run cars in on the load-track this lever had to be lifted to a vertical or perpendicular position. About two o'clock in the morning Mr. Rogers, the night boss, directed appellee and two other men working in the mine to clean up some coal at a point in the main south entry a short distance south of the third west. Appellee drove his mule hitched to an empty car, and, accompanied by his fellow-workmen, Downs and Younger, went to the place directed by the night boss. When they had loaded this car with coal they took it in the third west entry for the purpose of placing it on the track for loaded cars. Appellee was driving the mule, with Downs and Younger following. When they arrived at the switch the lever was down and the switch set for the empty track. Appellee stopped his mule, raised the lever and shifted the points of the switch so that his car would go in on the load-track. He then

started his mule up, but before the car had passed over the switch the lever fell and threw the car in on the empty track. His position was such that he did not see this and did not know the car was taking the empty track until about the time his fellow-workmen hallooed, "Look out!" and before he could escape he was caught between the cars and his leg crushed.

To keep the switch points in position for running cars in on the load-track, the boy who operated the lever was provided with a board having a notch cut in one end. This end of the board was placed against the lever when it was raised, with the lever in the notch and the other end of the board wedged against the rail. When thus secured the lever would remain in its vertical position. Unless so supported it was liable to fall from the jar in passing over the switch. Appellee had not worked in the third west entry and was not familiar with the switch. If the lever had been so constructed that when the switch points were set for one track the lever lay flat on the ground, and to change the points to the other track it would have to be thrown over in a semi-circle and dropped on the ground on the other side, which is the ordinary method of construction, no means would have been required to hold the lever and points in position after they had been shifted, so that cars could safely pass over the switch. The reason for the adoption of the method used by the appellant appears to have been to facilitate the rapid handling and shifting of the switch. This was made necessary from the fact that in making the flying switch with the motor, the testimony shows that a half second or less time was allowed for shifting the points of the switch after the motor had passed over and before the cars behind it had reached the switch. If appellee was engaged in the line of his duty when injured it cannot be said that there was no evidence tending to prove his case.

Appellant insists that it was not appellee's duty, and that it was not intended or required in the performance of his

work, that he should take the load of coal in the third west entry, but that it was his duty to have hauled the load to the bottom of the shaft. Appellee, Downs and Younger testified that the night boss never told them where to take the coal after they had loaded it in the straight south entry. Rogers, the night boss, testified he told appellee to haul it to the bottom of the shaft. They testified they took the load in to place it on the load-track and get another empty car to load in cleaning up the south entry. In the exercise of their judgment and to facilitate the work they were directed to do they took the load to the nearest point where loaded cars were stored for hauling to the bottom of the shaft, which was not over two hundred feet from the place they loaded the car, instead of hauling it between one-fourth and one-half mile to the bottom of the shaft. Under these circumstances, if no directions to the contrary were given, it cannot be said that appellee had no right, in the performance of his duty, to be in the place where he received his injury. It was the duty of appellant to use reasonable care to provide its employees with reasonably safe places and appliances for the performance of their duties. The mere fact that this appears to have been the first time that appellee had hauled a load in the third west entry cannot be said to show that he had no right to do so or that he was not acting in the line of his duty. When the car was loaded it was necessary that it be moved to some place and another empty car procured. If no instructions were given and no known custom prevailed, the appellee, Downs and Younger were left to the exercise of their own judgment and discretion as to where to place the loaded car and procure an empty one. There is no evidence of any custom in such matters, and if, as claimed by appellee, no directions were given, it cannot be said, as a matter of law, that he was wrongfully at the place where he was injured or that he was guilty of contributory negligence in going there.

It is also contended by appellant that the proof does not sustain the allegation of the declaration that it "became necessary for plaintiff, in the performance of his duty, to place a certain car loaded with coal upon the side-track," etc. It is argued that while it may not have been essential to have alleged that so placing the car by appellee was necessary, yet being so alleged the allegation must be proven, and the position taken by counsel is, that "necessary" means "indispensable," "unavoidable" or "that which must be." As no reason is shown by the evidence why the car could not have been hauled to the bottom of the shaft, it is said that it appears it was not necessary for appellee to haul it in the third west entry; that it could only be necessary to haul it there if there was no other place it could be taken to. The definition of the word "necessary" is as claimed by counsel, but the word is by no means always used in that sense. In *Chalcraft* v. *Louisville, Evansville and St. Louis Railroad Co.* 113 Ill. 86, it was held that in the statute requiring railroad corporations to construct farm crossings "when and where the same may become necessary, for the use of the proprietors of the lands adjoining such railroad," the word "necessary" meant "reasonably convenient." In *Vannatta* v. *Brewer,* 85 Ill. 114, it was said: "The word 'necessary' is not infrequently used in the law in a less restrictive sense than that of absolutely necessary." In *Aurora and Geneva Railway Co.* v. *Harvey,* 178 Ill. 477, the meaning of the word "necessity," as used in the statute in relation to horse and dummy railroads, was discussed, and it was held to mean "expedient," "reasonably convenient" or "useful to the public." In *St. Louis, Jacksonville and Chicago Railroad Co.* v. *Trustees of Illinois Institution for the Blind,* 43 Ill. 303, it was said: "The word 'necessary' has great flexibility of meaning. It is used to express mere convenience, or that which is indispensable to the accomplishment of a purpose. Under statutes exempting "necessary wearing apparel" or "necessary household furniture" of a debtor from an execu-

tion, it is held the word "necessary" means what is reasonably required for the convenience and comfort of the debtor and his family, and not what is absolutely indispensable. Chief Justice Marshall said in *McCullough* v. *State of Maryland,* 4 Wheat. 415, in discussing the meaning of the word "necessary:" "It has not a fixed character peculiar to itself. It admits of all degrees of comparison, and is often connected with other words which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed by these several phrases." That it was convenient and tended to greatly facilitate the performance of the work the appellee was engaged in for him to place the loaded car on the track in the third west entry, which was not more than two hundred feet from where he loaded it, instead of taking it from fourteen hundred to two thousand feet to the bottom of the shaft, is apparent, and we think it is in this sense that the word "necessary," as used in the declaration, must be construed.

When, at the close of all the evidence, appellee amended his declaration by striking out the allegation that he was directed by appellant to take the car to the place where he was injured, appellant entered a motion for a continuance and supported the motion by affidavit. Among other things the affidavit contained the following: "The defendant expects to prove and to be able to show *that it was not the duty of plaintiff to place the loaded car on the load-track in the third right entry off of the main south entry, but, on the contrary, his duty was not to place said car there;* that owing to the conditions existing on said track it was improper to place said car on said track, and that so placing said car on said track would impede and interfere with the proper operation of said mine; that there was no *duty,* general or special custom or course of conduct in said mine which would make it the duty of plaintiff to place said car

on said track." Counsel for appellee offered to admit that if the witnesses were present they would testify to what was stated in the affidavit except the portion italicized, and that portion of the affidavit was objected to as incompetent. The court sustained the objection, struck out that part of the affidavit and the remainder of it was admitted and the motion for continuance denied. We do not think there was any error in the court's ruling in this regard. The portion of the affidavit stricken out was not a statement of a fact but a conclusion to be drawn from facts. While it has been held proper to prove what the duties of a foreman are, (*Western Stone Co.* v. *Muscial,* 196 Ill. 382,) and whether a coal miner had any service or duty to be performed in the roadway or entryway, (*Chicago, Wilmington and Vermilion Coal Co.* v. *Moran,* 210 Ill. 9,) these decisions would not justify the admission of the language stricken out of the affidavit by the court. It would not have been competent for the witnesses, if they had been present, to have stated that it was not the duty of appellee to place the car in the third west entry or that it was his duty not to place the said car there. The portion of the affidavit admitted contained the statement that it was improper for appellee to take the car where he did take it, the reasons why it was improper, and that there was no general or special custom or course of conduct in the mine which would make it the duty of appellee to place the car on the track where he was injured. This, we think, is all that was stated in the affidavit that should have gone to the jury.

Some other questions of less importance are raised by appellant, but our conclusion is that the court properly submitted the case to the jury on the evidence, and the judgment of the Appellate Court is conclusive as to the facts. We are further of opinion that no reversible error was committed by the trial court, and the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*