(No. 15281.—Judgment affirmed.)

The Wabash, Chester and Western Railroad Company, Appellant, *vs.* The Commerce Commission *ex rel.* The Jefferson Southwestern Railroad Company, Appellee.

*Opinion filed October 20, 1923.*

1. Public utilities—*court cannot substitute its judgment for that of the commission.* On review of an order of the Commerce Commission granting a certificate of convenience and necessity the court is not authorized to put itself in the place of the commission, try the questions anew and substitute its judgment for that of the commission, but it should interfere with such order only when it is arbitrary or unreasonable or in clear violation of law.

2. Same—*points to be considered in reviewing order of commission.* In reviewing an order of the Commerce Commission granting a certificate of convenience and necessity, the inquiry is

limited to the questions whether the commission acted within the scope of its authority, whether the finding has a foundation in the evidence, and whether any constitutional right has been infringed by such order.

3. Same—*meaning of word "necessity."*  The meaning of the word "necessity," as used in the statute requiring a certificate of public convenience and necessity, is not limited to the sense of being indispensably requisite, but includes any improvement which is highly important to the public convenience and desirable for the public welfare.

4. Same—*the Commerce Commission may look to the future.* In determining whether to grant a certificate of convenience and necessity the Commerce Commission is not limited to a consideration of the present situation, but may, and should, look to the future so far as the public needs may be reasonably anticipated.

Thompson, J., dissenting.

Appeal from the Circuit Court of Jefferson county; the Hon. Charles H. Miller, Judge, presiding.

Williams, Lewis & Coffey, and Robert M. Farthing, (Joseph A. Connell, and Kenneth F. Burgess, of counsel,) for appellant.

Gilbert, Gilbert & Gilbert, and Barr & Barr, for appellee.

Mr. Justice Dunn delivered the opinion of the court:

The Jefferson Southwestern Railroad Company was incorporated in the State of Illinois on April 6, 1922, with a capital stock of one million dollars, for the purpose of constructing a railroad from a point in or near section 15, township 4, south, range 2, east, in Jefferson county, Illinois, to a point in or near the city of Mt. Vernon, in the same county. It immediately made application to the Illinois Commerce Commission stating its desire to construct and operate a railroad for carrying freight and passengers

from Mt. Vernon to section 15 and thence three and one-half miles westerly to the Chicago, Burlington and Quincy railroad and to transact a general railroad business, and praying for a certificate of public convenience and necessity for that purpose. The Wabash, Chester and Western Railway Company and other railroad companies appeared in opposition to the petition, but after a hearing the certificate prayed for was granted, and the Wabash, Chester and Western Railway Company having appealed from this order to the circuit court of Jefferson county, that court at its October term, 1922, affirmed the order of the commission. The Wabash, Chester and Western Railway Company has appealed from the judgment of the circuit court.

The territory through which the proposed railroad will run lies between the two forks of the Big Muddy river and at certain seasons of the year is rendered inaccessible by high water from these streams. The population is not dense and the traffic derived from agricultural products will not be great. While the railroad would be of some convenience to those living near it the number affected would be small, and the present needs of the farming community do not demand the construction of the railroad. Its construction would not be proposed were it not for the existence of a field of coal which it is proposed to develop and the population and industries which it is presumed will follow such development. The promoters of the construction of the railroad are the owners of the Illinois Coal and Coke Corporation, which controls nearly thirteen thousand acres of coal land in Jefferson county southwest of Mt. Vernon, which is the county seat and the northern terminus of the proposed railroad. It is the intention of this corporation to develop a mine in section 15 about eleven miles from Mt. Vernon, with a daily capacity of from 6000 to 7500 tons, and it is prepared to begin immediately the sinking of a shaft, with the expectation of reaching this production within two years. It is estimated that it will require

seventy-five years to exhaust the coal now under the control of the coal corporation. In connection with the development of the coal mine a town will also be established, which it is expected will have a population of five thousand within three or four years after the completion of the railroad. At Mt. Vernon the railroad will connect directly with the Chicago and Eastern Illinois railroad, and, by means of switching arrangements, with the appellant's railroad and with those of the Louisville and Nashville and the Southern railroad companies. At its other terminus the road will connect with the Chicago, Burlington and Quincy railroad. The coal property of the Illinois Coal and Coke Corporation is situated in the south part of Jefferson county. The Chicago and Eastern Illinois railroad extends through the county from north to south and through the city of Mt. Vernon and is about four miles east of the place where it is proposed to locate the mine shaft and the town. The Chicago, Burlington and Quincy railroad extends through the county north and south and is about four miles west of the place where it is proposed to locate the mine shaft and the town. The Wabash, Chester and Western railway extends southwest from Mt. Vernon in the same general direction as the proposed railroad from Mt. Vernon to the proposed mine and crosses the Chicago, Burlington and Quincy railroad at Waltonville, about three miles north of the junction of the latter railroad with the proposed railroad. The greatest distance between the proposed railroad and the Wabash, Chester and Western railway is four miles and the average distance is two miles. Mt. Vernon is a city of about ten thousand population. Its principal industries are a car factory, shoe factory, candy factory, creameries, branch packing houses, and its estimated coal consumption is from 100,000 tons to 125,000 tons annually. This coal comes from various sources, some of it requiring a haul of forty-seven miles. Here, besides the appellant's railroad, are three trunk lines, affording service in every direction. At

the other terminus of the proposed line is the Chicago, Burlington and Quincy railroad,—another trunk line.

Five hundred thousand dollars of the $700,000 of capital stock authorized by the Commerce Commission has been subscribed,—about $175,000 by stockholders of the coal corporation and the rest through the efforts of its president. Evidence was introduced to show the probable revenue of the railroad company during the first four years of development. The operating expenses of the first two years were proposed to be capitalized but an estimate of them for the next two years was presented, and on the evidence submitted it was claimed that the return on the investment in 1925 would be equal to six per cent and at the time of full development fifteen per cent. There is evidence which fairly tends to show that the proposed railroad could be operated at a profit and earn a fair return on its cost, and on the other hand there is evidence tending to cast doubt on this proposition. At the hearing before the commission attorneys for the Chicago and Eastern Illinois, the Chicago, Burlington and Quincy and the Wabash, Chester and Western Railroad Companies expressed the willingness of their companies to build spurs to the proposed mine and introduced evidence to show that the coal could be transported more quickly and cheaply by such spurs than by the proposed railroad. They also introduced evidence to show that most of the large mines now operated in Illinois are not located on independent short railroads and that such railroads are generally unprofitable in Illinois.

The motive which actuated the promoters of this railroad was naturally their own profit. A railroad is essential to the operation of a coal mine, and they regarded an independent railroad as more convenient and advantageous to their interest than a spur-track or spur-tracks from neighboring railroads. Their convenience and advantage were not, however, alone sufficient to justify the granting by the Commerce Commission of a certificate of public convenience

and necessity. By their petition, therefore, they presented to the commission the question whether public convenience and necessity required the construction of such railroad. The commission having found that public convenience and necessity require the construction of the railroad and having granted the certificate prayed for, the question presented by this appeal is whether the facts which have been recited fairly tend to sustain the order. *Chicago Motor Bus Co.* v. *Chicago Stage Co.* 287 Ill. 320.

The right to review the findings of the Commerce Commission in a proceeding such as this is limited to the questions whether the commission acted within the scope of its authority, whether the finding is without any foundation in the evidence, or whether a constitutional right has been infringed by such finding. (*Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com.* 268 Ill. 49; *Interstate Commerce Com.* v. *Union Pacific Railroad Co.* 222 U. S. 541.) Orders of the commission are entitled to great weight, and can be set aside only if arbitrary or unreasonable or in clear violation of a rule of law. Courts should review or interfere with them only so far as necessary to keep them within their jurisdiction and protect constitutional rights. (*People* v. *McCall,* 219 N. Y. 84.) The law does not authorize the court to put itself in the place of the commission, try the question anew and substitute its judgment for that of the commission. The court should not usurp legislative or administrative functions by setting aside a legislative or administrative order on its own conception of the wisdom of it. (*State* v. *Great Northern Railway Co.* 130 Minn. 57.) The courts will not interfere with an order of the commission when it does not appear from the record that the order is unlawful or unreasonable. *Settle* v. *Public Utilities Com.* 94 Ohio St. 417.

The Illinois Coal and Coke Corporation proposes to sink a shaft as soon as transportation facilities are available and bring into operation a large coal mine producing 6000 tons

or more a day of an excellent quality of bituminous coal. Perhaps it is questionable whether the development of such a mine is a matter of public convenience and necessity. In some communities it is regarded so, and we are not prepared to say that the Commerce Commission had no substantial evidence on which to find it so. The question whether the transportation facilities furnished by two stub-tracks were adequate to the requirements of the mine, of the mine workers and of the population of the town expected to grow up there and of the industries which would probably be established, was a question to be determined by the commission from a consideration of all the circumstances. When the statute requires a certificate of public convenience and necessity as a prerequisite to the construction or extension of any public utility, the word "necessity" is not used in its lexicographical sense of "indispensably requisite." If it were, no certificate of public convenience and necessity could ever be granted. The first telephone was not a public necessity under such a definition, nor was the first electric light. Even the construction of a water-works system in a village is seldom necessary though highly desirable. However, any improvement which is highly important to the public convenience and desirable for the public welfare may be regarded as necessary. If it is of sufficient importance to warrant the expense of making it, it is a public necessity. (*Park and Boulevard Comrs.* v. *Moesta,* 91 Mich. 149.) A thing which is expedient is a necessity. (*Warden* v. *Madisonville, Henderson and Evansville Railroad Co.* 128 Ky. 563.) Inconvenience may be so great as to amount to necessity. (*Lawton* v. *Rives,* 2 McCord L. 445.) A strong or urgent reason why a thing should be done creates a necessity for doing it. (*Todd* v. *Flournoy,* 56 Ala. 99.) The word connotes different degrees of necessity. It sometimes means indispensable; at others needful, requisite or conducive. It is relative rather than absolute. No definition can be given that would fit

all statutes.   The meaning must be ascertained by reference
to the context and to the objects and purposes of the stat-
ute in which it is found.   (*Wisconsin Telephone Co.* v.
*Railroad Com.* 162 Wis. 383.)   The Commerce Commis-
sion has a right to, and should, look to the future as well
as to the present situation.   Public utilities are expected to
provide for the public necessities not only to-day but to an-
ticipate for all future developments reasonably to be fore-
seen.   The necessity to be provided for is not only the
existing urgent need but the need to be expected in the
future, so far as it may be anticipated from the develop-
ment of the community, the growth of industry, the in-
crease in wealth and population and all the elements to be
expected in the progress of a community.

The petition presented a case within the jurisdiction of
the commission to determine.   On the question of public
necessity there was evidence tending to show that the project
of the development of the mine and the construction of the
railroad, which were inseparably connected, could be profit-
ably carried out and was therefore expedient so far as the
question of expense was concerned.   No constitutional right
of appellant or others was invaded.   The appellant's busi-
ness was not interfered with in any way, but the object of
the owners of the mine was not to injure railroads already
constructed or compete with them for their established traf-
fic, but was to make an important development of new busi-
ness and additional traffic.   The commission having found
that from those circumstances a case of public necessity for
the construction of the railroad arose, its finding cannot be
regarded as without evidence fairly tending to sustain it.

Our attention has been called to the order of the Inter-
state Commerce Commission denying the prayer of the Jef-
ferson Southwestern Railroad Company to engage in inter-
state commerce.   We cannot review that decision nor can
we give it any weight in the determination of this case.
The fact that two administrative bodies having somewhat

similar functions have arrived at different conclusions upon somewhat similar records cannot be given any weight. The question before us is whether the decision of the Illinois Commerce Commission has any support in the record. The fact that another body arrived at a different conclusion on a similar record cannot affect that question.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*

Mr. Justice Thompson, dissenting:

It is with regret that I find myself at variance with the majority of the court on this important question, but I consider the points involved to be so vital that I feel constrained to set out my views at some length.

The first proposition decided by the court is one that will affect every case arising under the Public Utilities act. It is said that the right to review the finding of the Commerce Commission is limited to the questions whether the commission acted within the scope of its authority, whether its finding is without foundation in the evidence, and whether a constitutional right has been infringed. With this I do not agree. Section 68 of the Public Utilities act allows an appeal to the circuit court for the purpose of having the reasonableness or lawfulness of the decision of the Commerce Commission considered and determined. The court must consider the case on the evidence heard by the commission and has authority to confirm or set aside the commission's decision. Due process of law requires submission of the questions involved to a judicial tribunal for determination upon its own independent judgment as to both law and facts, according to the settled rules governing judicial action and decision. (*Commerce Com.* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co. ante,* p. 165.) All doubts as to the propriety of means or methods used in the exercise of the powers clearly conferred upon the commission should in the interest of the administration of

the law be resolved in favor of its action, and where the facts are controverted and the decision depends upon credit to be given contradictory testimony, the courts will give great weight to the finding of the commission, which is qualified by experience and special study to weigh the facts and circumstances applicable to cases within its jurisdiction. It is, however, the duty of the courts, in reviewing the decision of the commission, to weigh and consider the evidence, and if it is found that the order of the commission is against the manifest weight of the evidence it should be set aside. It is not enough that there is some evidence in the record which, if it stood uncontradicted, would justify the order. To be sure, it is not intended that the courts shall assume the duties of the commission and try anew matters within its jurisdiction, but that does not relieve the courts from performing a function delegated to them by the constitution. The Commerce Commission has no arbitrary powers, and if, in view of the evidence, its order is not reasonable it is the duty of the court to set it aside. *West Suburban Transportation Co.* v. *Chicago and West Towns Railway Co.* (*ante,* p. 87.)

All efforts to explain the meaning of "public convenience and necessity" do not make the meaning more clear than the words themselves. I have searched in vain to find a better definition. No one contends that it is necessary to show that a public utility is absolutely indispensable before a public convenience and necessity is shown. In construing similar language in other statutes it has been held that the word "necessary" means that there is a strong and urgent need. (*Wisconsin Telephone Co.* v. *Railroad Com.* 162 Wis. 383, L. R. A. 1916E, 748; *Brooks* v. *Chicago, Wilmington and Vermilion Coal Co.* 234 Ill. 372; *Aurora and Geneva Railway Co.* v. *Harvey,* 178 id. 477; *Chalcraft* v. *Louisville, Evansville and St. Louis Railroad Co.* 113 id. 86.) The convenience or necessity, to be public, must concern the public as distinguished from an individual or any

number of individuals. (*West Suburban Transportation Co.* v. *Chicago and West Towns Railway Co. supra; Public Utilities Com.* v. *Toledo, St. Louis and Western Railroad Co.* 286 Ill. 582.) Public necessity does not exist unless the inconvenience would be so great as to amount to an unreasonable burden on the community. There must be an urgent, immediate public need. A mere balance of convenience, a mere advantage which would otherwise be lost, is not enough.

As I read this record, the finding of the commission is not only against the manifest weight of the evidence but is without any substantial foundation in the evidence. Without any consideration of the evidence of the objectors, the evidence of the petitioner shows that a public convenience and necessity does not exist. The proposed road is to be fourteen and one-half miles long and is to connect with the Chicago and Eastern Illinois railroad at Mt. Vernon and with the Chicago, Burlington and Quincy railroad about three miles south of Waltonville. For all practical purposes it parallels three existing railroads and serves no point which is now more than four miles from a railroad. But a few hundred people will live nearer a railroad after the new road is built. Jefferson county is approximately twenty-four miles square and has a population of less than 30,-000, one-third of which is in Mt. Vernon, the county seat. Three trunk line railroads,—the Chicago and Eastern Illinois, the Louisville and Nashville, and the Southern,—cross at Mt. Vernon, giving the territory railroad service north, east, south and west. The Wabash, Chester and Western railroad runs from Mt. Vernon to Chester. The Chicago, Burlington and Quincy railroad traverses the western half of Jefferson county, and the Illinois Central railroad runs along its west boundary. These roads cross or connect with every railroad of importance in the State of Illinois. The accompanying map describes the territory much more clearly than words:

The dotted area designates the coal lands which it is proposed to develop, and the broken line designates the railroad which the commission has held public convenience and necessity demand. It can be seen at a glance that a spur four miles long will give the new mine exactly the same railroad connection with the Eastern Illinois as it is to get by the independent line eleven miles long. If this mine is developed, spur tracks will be built from the existing railroads, and the mine will be given exactly the same service as is given similar mines all over southern Illinois. The proof shows, without contradiction, that short lines of this type are not profitable. It also shows that the coal from this mine can be more rapidly and more cheaply placed on the market over spurs of existing lines than by a joint arrangement with existing trunk lines and the independent road which the coal operators propose to build. This new railroad will be dependent upon one industry, and that an industry which is already greatly over-developed. The road now owns no engines or cars, and it expects to get most of its cars from existing railroads. It is manifest to anyone reading this record that the sole purpose in building this railroad is to secure an advantage in freight rates. An originating line is entitled to a division of the carrying charge, and through negotiation with trunk line railroads the promoters of this new coal field can gain an advantage over their competitors by getting favorable division of through freight rates and an absorption of switching charges. If government regulation of railroads can be justified at all, it is by preventing the very thing this order permits.

There is no gainsaying the fact that the railroad is being built to serve the private needs of the coal company. Without question the new road would be convenient for those commercially interested, but that is neither a public convenience nor a public necessity. In order to give some color to the claim that the public is interested, it is argued

that the mine, when fully developed, will employ 800 or 900 men, and that they, with their families, will make a city of 4000 or 5000 people. In the face of the pendency of this case on appeal in this court the promoters of this town site advertised lots for sale three months ago, and in their advertisement they said the new railroad was being built and the mine was being developed. This city is only a figment of the promoters, and a mere glance at the map shows that the city will never be a reality. Another effort to show that the public is interested in the construction of this new road was made by introducing testimony to the effect that the two forks of the Big Muddy river, which flow along the eastern and western boundaries of the territory, frequently overflow and that the farmers residing in the territory can not cross to the existing railroads. Strange to say, none of these marooned farmers were called as witnesses, and so none of them testified that this railroad was needed or that it would be any more convenient for them than the existing railroads. It does not take an expert to know that the development of another coal mine will not serve the interests of the public. There is now an over-development of the coal industry in the United States and producing mines in Illinois have much larger capacity than the demand requires. To develop this new mine will simply add to the national investment in coal mines and the public will pay an income on this inflated investment. Every time a public utility is built capital is invested, and that capital will demand a return. The public must pay this return, and if the utility is not needed the added burden is not justified. By building short spurs from existing railroads these coal lands can be adequately served, and it can be done with less than one-fifth as much addition to the national investment in railroads as by building an independent line. The Commerce Commission makes it clear that it considered only the private convenience of the promoters. In its order it says: "The arrangement proposed by the petitioner will be a mat-

ter of great convenience to the Illinois Coal and Coke Corporation. It is not necessary to show that there is a great necessity for the construction of the proposed railroad."

While I have great respect for the judgment of my associates on this question, I feel that the order entered in this case is contrary to the spirit as well as the letter of the Public Utilities act.