Forsell v. Suddard.

---

## Charles E. Forsell and Ida Forsell v. Joseph W. Suddard and Arthur S. Welch, Receivers.

1.   BUILDING AND LOAN ASSOCIATIONS.—*Usurious Premiums.*—A premium in a building and loan association not fixed by bidding and which is not the result of a competitive sale of the money on hand for loaning, is usurious.

**Mortgage Foreclosure.**—Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1899. Reversed and remanded. Opinion filed July 31, 1900.

WHEELER & SILBER, attorneys for appellants.

PAM, CALHOUN & GLENNON, attorneys for appellees.

MR. PRESIDING JUSTICE HORTON delivered the opinion of the court.

This is an appeal from a decree entered by the Circuit Court in a suit for the foreclosure of a mortgage given by appellants to the Mechanics' & Traders' Savings, Loan and Building Association, a corporation organized under the laws of the State of Illinois governing building and loan associations.

August 1, 1897, said association ceased to do business, and December 22, 1897, appellees were appointed receivers of the association under a decree of the Circuit Court finding said association to be insolvent, and directing its affairs to be wound up.

January 21, 1889, appellant Charles E. Forsell, being then the owner of sixteen shares of its stock, applied to said association for a loan of $1,600. Upon such application a loan was agreed upon, and to secure repayment thereof said mortgage was given. Said association paid on account of said loan $1,231.25, and retained $368.75, the balance of said sum of $1,600, as premium. Said sixteen shares of stock were assigned to said association as collateral security. Appellant made all his stock and interest payments up to the time said association became insolvent and ceased to do business. He had also paid $262.50 on account of the principal of said loan.

Section 8 of the statute of Illinois, relating to such associations, in force at the time this loan was made (see Starr & Curtis' Stat., Ch. 32, Sec. 115), provides:

"The board of directors shall hold such stated meetings not less frequently than once a month, as may be provided by the by-laws, at which the money in the treasury, if one

Forsell v. Suddard.

hundred dollars or more, shall be offered for loan in open meeting, and the stockholders who shall bid the highest premium for the preference or priority of loan shall be entitled to receive a loan of one hundred dollars, less the premium bid for each share of stock held by said stockholders."

Section 1, Art. 5, of the by-laws of said association provides:

"The board of directors * * * at their stated meetings shall offer for loan the funds of the association, as provided in section 8 of the same act."

In their answer to said bill, appellants deny that there was any bid for the privilege of obtaining said loan, and deny that the principal appellant, Charles E. Forsell, bid any sum whatever as a premium on said loan, but admit that the principal appellant agreed to pay said premium. Said answer prays that an accounting may be had and that said appellant be charged with only the amount actually received by him on account of said loan and interest thereon at the rate of five per cent.

Upon the hearing before the master in chancery, appellees offered in evidence an extract from the records of said association, as to a meeting of the directors held January 21, 1889, wherein it is stated :

" The money on hand for sale was awarded to the highest bidder for premium, as follows, to wit:   Charles E. Forsell, sixteen shares, at a premium of twenty-five per cent."  .

And at said hearing appellant offered to prove that said principal appellant never had any conversation with any officer of said association in relation to the bidding of any premium for said loan; that he was not present at said meeting of directors, and that he never bid or authorized any one to make any bid for him of any premium for a loan on his behalf from said association.   And appellants caused questions to be propounded to witness at said hearing for the purpose of establishing the correctness of said offer to prove.   Upon the objection of appellees, such testimony as proof was excluded.   The master in the accounting, made and reported by him, included the amount of said premium as a part of the amount due to appellees.

Counsel for appellants here contend that the court below erred in entering a decree charging the premium of $368.75, for the following reasons:

" First. The premium was not fixed by bidding, and was not the result of a competitive sale of the money on hand for loan.

" Second. A premium which is not the result of competitive sale is usurious."

The question thus presented has never been decided by the Supreme or one of the Appellate Courts of this State so far as we are advised.

On the part of appellees it is contended that the question of usury is not raised by the answer of appellant, and that therefore these contentions can not be considered by this court. This objection on the part of appellees is not well founded. It is not necessary that the answer should contain the word " usury." It is sufficient if it contain such averment of facts, as would constitute usury, if proven.

If the premium charged to the principal appellant was not fixed by bidding, *i. e.*, by a competitive sale, as required by said statute and said by-law, and if that be usury, then it was error to exclude the testimony offered by appellant and to include in the decree entered in this cause the amount of said premium.

In McCauley v. Building & Savings Association, 97 Tenn. 421, it appears that the appellant there was a stockholder in the appellee association in the sum of $1,600. She made a loan from that association and gave her note therefor for the sum of $1,600. She received upon her note $1,120 and the association retained $480 as premium. The statute of that State and the by-law of that association are in legal contemplation and effect, and in regard to the question here involved, the same as the statute of Illinois and the by-law above quoted. Appellant in that case had not bid for the loan, and it was held that the contract was infected with usury. The opinion of the Supreme Court of Tennessee in that case is so complete and exhaustive and so commends itself to us that we quote therefrom at length:

. " * * * In their original conception their object was to enable the poor and those of small means and incomes to acquire homes and build houses, and thus to become better citizens and more identified with the growth and welfare of the country. The original purpose is well foreshadowed by the name of ' Building Associations,' and the loan feature was a mere incident to effect its primary object. The theory was to enable persons whose earnings were small to become, by a system of compulsory saving, the owners of homesteads, either at the end of a certain time or in anticipation of it; and the scheme, as originally framed, was not complicated or difficult to understand. * * *

As originally designed, their object was in the highest degree laudable, and consonant with the broadest public policy. It was these features that commended them to public favor and to the special consideration of legislatures to such an unusual degree. But building and loan associations, when used as mere depositories for the idle money of the capitalist, large or small, to be used in loans to enrich the depositor at the expense of the needy borrower, would never have acquired the unusual rights and powers given them by the different legislatures. It has been well said that the desirableness of augmenting the proportion of landowners, and to add houses among the working classes, was such a weighty consideration that legislatures were willing, in order to effect it, to make exceptions to many of the best settled rules of policy applicable to dealings between man and man. But many of these associations have gone astray from their real purpose, and made themselves mere money lending devices; and scheme after scheme has been added to the original plans, until their systems have become so complicated that the members do not understand them, and often are entrapped by them; and their results can only be reached, if at all, by an expert, after long and uncertain calculations. Just so far as they have held to the primary purposes of their creation and conformed to the statutes giving them extraordinary privileges, just so far ought they to be encouraged and upheld by the court; but just so far as they depart from that original design, and fail to conform to the statutes, and make themselves mere savings banks or loan institutions, to gather unlawful interest and entrap and oppress the needy, they should be restrained. In their original conception, one of the leading features was that the members were kept upon a strictly co-operative basis, with mutual advantages and benefits, and, if profits were realized, they were equally distributed between the bor-

rowers and those who did not borrow, keeping in view all the time the primary object of furnishing homes for those who desired them. It is upon this idea that a premium over lawful interest was allowed to be paid for the loan of money, and, in order that all might stand upon the same footing, the money loaned was offered in free and fair competition, and the profits earned went equally to the borrower and member who did not borrow.    *    *    *

It is also said that if the scheme is carried through as designed there will not only be no usury in the transaction, but that the borrower will have had the use of the money borrowed at a less rate than six per cent, the legal rate of interest.    This, of course, contemplates the entire execution of the contract for a term of years, and makes no allowance for mismanagement, unfortunate investments, and the hundred and one contingencies that attach to all business transactions extending over a series of years.    The contract, upon its face, being unauthorized, illegal, and not warranted by law, the court will not compel the borrower to continue it for years, meeting its exactions of fines and dues and interest, upon a possibility that, perchance, in the final wind-up, the borrower may be shown to have paid no more than legal interest."

In Douglass v. Kavanaugh, 90 Fed. Rep. 373, the opinion of Mr. Justice Wilkes in the McCauley case is definitely approved and followed upon the question of usury.

In Bates v. People, 42 Ohio St. 655, a similar question was presented.    The court says in that case (p. 672):

"*    *    *    The provision of the statute is that such corporation may collect from its members stated 'dues, fines, interest on loans advanced, and *premiums bid by members and depositors for the right of precedence in taking loans,*' etc., 'provided that the dues, fines and premiums *so paid* by members or depositors of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loans so taken usurious.'    The premium named in the note is unlike the premium named in the statute.    It was not measured or ascertained by competitive bidding among the members and depositors, as we understand the statute to require.    It was, in fact, a part of the price named by the lender to be paid by the borrower for the use of the money loaned.    The assent of the borrower to pay the price required, did not make him a bidder within the meaning of this statute.

Forsell v. Suddard.

Calling the excess above the highest legal rate a *premium*, did not change the nature of the transaction. It was usurious."

In the case of Stiles' Appeal, 95 Pa. St. 122, it appears that Stiles appealed from an order of the court below refusing to open a judgment against him and let him into a defense. The question before the Supreme Court of Pennsylvania was the same as that now before this court. That court says (p. 125):

"* * * They can loan money only to members of the association—in amounts not exceeding two hundred dollars on each share of stock held by them—and the loans can only be of the amount in the treasury derived from the interest, dues and fines received from the members and given out at each stated monthly meeting to the highest bidder. It would be a gross perversion of the whole spirit and design of such an association to borrow money from banks or others for the purpose. It is equally so to fix a minimum rate of premium, below which they will accept no bid. They are bound to offer all that is in the treasury to open competition so that the members may obtain the loan at a low premium if there should be no bid at a higher. The practical operation of such institutions is that wherever the member procures a loan at a premium below the average of the premiums for the whole time the association has to run, he is to that extent a gainer; where his loan is at a premium higher than the average, he is to that extent a loser. This is a most valuable feature in such associations, and hence the great importance of maintaining the principle of free competition in the bids."

In Brown v. Archer, 62 Mo. App. 277, upon this question the court says (p. 289):

"* * * The statute provides for premiums in section 2812, where it is provided that the money determined by the directory to be loaned shall be offered to the shareholders in open meeting and that the shareholder who shall bid the highest for the preference of the loan shall be entitled to receive it. In this case no proceedings of this nature were had. Instead of this statutory mode of ascertaining what the premium would be in making loans, the directory seems to have adopted an arbitrary sum as a fixed premium. This will not do. The amount charged here as a premium was usury, unless it be exempted by the statute, and, as we

have seen, the statute only exempts it when it has been charged in the manner provided."

See also, Thompson on B. & L. Ass'ns, 2d Ed., Sec. 191; Ohio ex rel., etc., v. Greenville Bldg. Assn., 29 Ohio St. 92, 100; Myers v. Alpena L. & B. Assn. (Mich.), 75 N. W. Rep. 944, and numerous cases cited in cases quoted from.

Under the statutes of this State in force at the time said loan was made, the rate of interest allowed was six per cent, except that by special contract in writing the parties might agree upon any rate not exceeding eight per cent. To this general provision "Homestead Loan Associations," as they are called in our statute, are made a special exception in case they comply with certain provisions of the statute under which they are organized. If in the making of a loan they do not comply with certain provisions of the statute they are subject to the general statute relating to interest as are other corporations or individuals. As we have seen, testimony was offered by appellant tending to show that in making said loan the association did not comply with the provision of the statute or its by-laws relating to bidding for loans. If it did not, then the contract for a greater rate of interest than eight per cent was erroneous. Such testimony should have been admitted, and if it were established that said association did not comply with the statute or its by-laws in the manner indicated, then it should be found that said contract was usurious and a decree entered accordingly.

It is also urged by counsel for appellant that said association having failed and being unable on its part to perform its contract with appellant, that appellant is therefore excused from performance thereof on his part. There is much force in this contention. Suppose that said association had failed at the end of six months instead of eight years. The premiums deducted, together with the interest payments, would amount to about thirty-five per cent of the money paid to appellant on said loan, or at the rate of about seventy per cent per annum. Where a statute might possibly be construed to produce such a result, the party

claiming it must· have met. the requirements of the stat‐ ute in every particular.

In the case of Bates v. Equitable B. & L. Assn., 65 Ill. App. 529, cited by counsel for appellees, it was held that although there was some irregularity in the manner in which the bid was made, that a bid was so made that Bates was estopped from claiming that he did not bid for the loan, and that he could not, therefore, invoke the aid of the usury laws of the State.

In the case of Conservative B. & L. Assn. v. Cady, 55 Ill. App. 469, also cited for appellees, a bid was in fact made by the borrowing member.   The language used by the court must be understood in connection with the facts in the case. There the bid made was at first accepted at a meeting of the directors when only a minority of three were present. At a subsequent meeting of the directors, and before the loan was consummated, and when a quorum was present, the action of the three directors was ratified.

Appellant contends that a tender of the full amount due was made and that therefore no interest can be allowed to appellees after that date, and that for the same reason, no allowance can be made for solicitor's fees as provided by the mortgage. · This contention can not be sustained. The testimony does not show a tender sufficient in law.

Counsel have entered into very elaborate and complicated mathematical calculations for the purpose of showing or illustrating the theory or rule which they respectively con‐ tend should be adopted in computing the amount due upon the note and mortgage in question.   It is not deemed neces‐ sary to review the question thus presented in view of the conclusion before expressed upon the question of usury.

The original and primary object of forming building and loan associations was that of aiding persons of limited means to procure homes.   When properly and honestly managed the object may be, and often has been, attained. But unfortunately and as the result of incompetent manage‐ ment, or the acts of dishonest officials, or the work of " wreckers," there is, in many cases, but little salvage left

for the unfortunate members. And this is more earnestly to be regretted from the fact that a very large percentage of the members are poor people who have been, in too many instances, robbed of their hard-earned savings. It is the existence of these facts that has brought such associations into such disrepute, that honestly managed societies can, in but few instances, succeed.

But the fact that some members of an association suffer loss can not operate to deprive other members of their legal rights. Calling the $368.75 retained by the association "premiums" does not make it such. As said in Brown v. Archer, *ante :*

"The amount charged here as premiums was usury, unless it be exempted by the statute, and, as we have seen, the statute only exempts it when it has been charged in the manner provided."

Said association is not authorized to charge excessive interest simply because it is organized as a "Homestead Loan Association." If, by its secretary, or other officers, it simply contracts to loan money at a greater rate than that allowed by the general statute, it is subject to the law as to usury the same as is any other party. The only way in which it can legally collect or retain a greater rate of interest than that allowed to others, is by complying with the provisions of the statute as to the making of the loan for which it seeks to receive such excess of interest. Upon a simple contract or agreement to loan money, made in the same manner as would be made between two private individuals, a building and loan association has no more right to collect excessive interest than a private individual would have. The retaining, under such a contract, of a greater sum than the rate allowed by general statute, and calling it premium, does not relieve the contract from the operation of usury laws. The testimony offered would tend to show such a contract, and should have been admitted.

The decree of the Circuit Court will be reversed and the cause remanded for further proceedings not inconsistent with the views here expressed. Reversed and remanded.