## 142    Appellate Courts of Illinois.

## Joseph P. Wightman, Jr., et al., v. Joseph W. Suddard et al.

1. Usury—*Building and Loan Associations—Illegal Premiums.*—A premium not fixed by bidding and which is not the result of a competitive sale of the money of a building and loan association on hand for loaning, is usurious.

2. Estoppel—*To Plead Usury.*—A grantee who takes real property by conveyance, without any agreement, expressed or implied, to assume and pay a mortgage upon it, or without any deduction on account of such mortgage being made from the purchase price, is not estopped from raising the defense of usury on the foreclosure of such mortgage.

Foreclosure of a Trust Deed.—Error to the Circuit Court of Cook County; the Hon. Richard W. Clifford, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Reversed and remanded, unless, etc. Opinion filed January 15, 1901. Order reversing and remanding, entered February 8, 1901.

W. A. Hamilton, attorney for plaintiffs in error.

Pam, Calhoun & Glennon, attorneys for defendants in error.

Mr. Presiding Justice Shepard delivered the opinion of the court.

The bill in this case was filed to foreclose a trust deed in the nature of a mortgage made by one Edgar T. Paul and wife, to secure the promissory note of the plaintiff in error Wightman, for $2,100, given to evidence a loan made by the Mechanics and Traders Savings, Loan and Building Association. The note and trust deed bore date March 17, 1890. On that date the said Paul made a written application, in the name of Wightman, for the loan, and the loan was awarded to Wightman on twenty-one shares, at a premium of twenty per cent—Paul agreeing to give the trust deed security. The written application was addressed to the board of directors and recited that Wightman " having obtained the preference for a loan on twenty-one shares of the capital stock of your association in the 28th series, issued

January, 1890, at a premium of twenty per cent," and concluded that, " should the security be accepted, I agree to be governed by and comply fully with the charter and by-laws of your association."

The recital in the application that Wightman had obtained the preference for a loan was not true; it was nothing more than a form.  The negotiations were conducted by Paul with the secretary of the association, who told Paul that a premium of twenty per cent would be charged for the loan, and Paul agreed for Wightman, with the secretary, to pay that premium.  At that time the matter had never been presented to the board of directors.  Neither Paul nor Wightman was ever present at a meeting of the board of directors, or bid or competed for the loan.  The arrangements were made wholly with the secretary, as above stated.  The result was that Wightman executed and delivered the note, and Paul the trust deed, and the association paid over $1,680—being the amount applied for, less the premium of twenty per cent, or $420.

The defendant in error Morley, subsequently purchased the mortgaged premises from Paul, without any actual knowledge or information concerning the existence of the trust deed, for the full sum of $2,750, with no reduction on account of the incumbrance.  Some two years after his purchase Morley first learned of the trust deed and note, and obtaining a settlement of some kind with Paul, he then took Paul's pass book in which were entered the payments of installments of interest and dues, and thereafter made all payments as they matured.  All payments on the loan, either of interest or otherwise, were made continuously in the name of either Wightman or Morley, from the beginning of the loan down to July 8, 1897, at which date the defendants in error were duly appointed receivers of the association by the decree of a court of competent jurisdiction.

During this time $955.50 was paid on the stock and $1,232 for the interest.  A failure to agree with the receivers as to the amount due, resulted in the filing of this bill

to foreclose on July 21, 1898. The report of the master in chancery and the decree of the Circuit Court based thereon finds that there is still due $1,577.01.

The principal error relied upon and to which we will confine our consideration is that the loan was usurious. It is not denied that except for the special privileges accorded by the statute to loan and building associations the rate charged for the loan in question would be usurious. The provision of the statute of this State in relation to the method by which loan and building associations may loan their money, requires that "the board of directors shall hold stated meetings at which the money in the treasury, if $100 or more, shall be offered in open meeting for loan, and the stockholders who shall bid the highest premium for the preference or priority of loan, shall be entitled to receive an amount of $100 for each and every share of stock held by said stockholder."

It is conceded that the agreement for the payment of twenty per cent premium for the loan in question was made with the secretary of the association. There was no bidding for the loan. It was no more nor less than a fixed minimum premium, announced by the secretary and assented to by the borrowing stockholder. It is difficult to see wherein there was any attempt at compliance with the statute.

The method pursued by the association in making its loans, is stated by one of the directors who testified before the master and is uncontradicted as follows :

" I was a director in March, 1890, when this loan was made.

Q.  Do you know in what way the premiums on loans were fixed at that time ?  A.  The secretary would bring in a number of applications that were made for loans and state to the directors the amount of premium that had been settled upon for the borrower to pay.  The president of the board of directors would ask for bids upon the money of the association to be loaned, and the directors would bid up to the amount of premium fixed by the secretary.  For example, if the loan was to be made at twenty per cent, some director would bid ten per cent, another would bid

fifteen per cent, another would bid twenty per cent, and when it had arrived at twenty per cent, why the money was sold at that, and then the question of taking up the loans would be considered.

Q. Was that the method used during all the time you were director? A. I have no recollection of any other method being used, or any other persons bidding than a director. I do not ever remember missing a meeting of the directors while I was in the city.

Q. In pursuing that method, was the premium ever bid up above the amount stated by the secretary? A. Not to my knowledge.

Q. Were the loans ever passed upon and allowed at a premium less than stated by the secretary? A. No, sir. * * *

Mr. French was really the business manager of the association, and knowing best what was necessary to meet competition and get business, his advice and opinion were virtually accepted by the board of directors. * * *

Q. While you were a member of the board of directors, did applicants for loans personally appear before the board and bid for the preference of loans? A. No, they never appeared and bid for loans to my knowledge.

Q. In making these bids, which you say the directors did, and bringing the premium up to the amount stated, did they state they bid the premium for such and such an applicant, or how did they state it? A. The president would ask for bids for the sale of money; we sold the money, and bids were asked for it, and the directors bid for the premiums.

Q. When a director would say, 'I bid ten per cent,' would he say 'I bid ten per cent for John Jones,' or just generally? A. No, sir; just generally."

In our opinion such a method of loaning the funds of the association was a plain perversion of the statute.

This court has recently held that a premium not fixed by bidding, and which is not the result of a competitive sale of the money of a loan and building association on hand for loaning, is usurious. Forsell v. Suddard, 90 Ill. App. 407.

The reasons and authorities in support thereof may be seen in that opinion; we need not repeat them. Since that case was decided the Supreme Court has handed down an opinion in Lurton v. Jacksonville Loan and Building Asso-

ciation, 187 Ill. 141, which, it is contended, does in effect announce a doctrine opposed to our holding in the Forsell case, *supra*.

An examination of the facts of the Lurton case as stated in the opinions of the Appellate Court (87 Ill. App. 395) and the Supreme Court, disclose what to our minds marks a clear distinction between that case and the Forsell case and the one at bar, so far as the usury question is concerned.   The distinguishing feature is that in the Lurton case there was a bid of the same premium made by Mrs. Lurton, through her agent, at a regular meeting of the board which preceded her written application, while in the case at bar no bid was ever made.   And it appears, also, in the Lurton case, that at that prior meeting of the board other loans were made at premiums of nineteen per cent and eighteen per cent to bidders therefor, and that Mrs. Lurton's agent bid the same premium, eighteen per cent, as that made at the last sale of money, thus showing competition in fact in fixing the premium.   In the language of the Appellate Court, these facts furnish "a complete refutation of the contention that the directors arbitrarily fixed the premium." The loan having been made as indicated, it was beyond the protection afforded by the statute, that "no interest, premium, fines, nor interest on such premiums, that may accrue to said corporations according to the provisions of this act, shall be deemed usurious."

The contract being tainted with usury, the defense was open to Paul and his grantee, Morley, who took the property by conveyance from Paul without any agreement to pay the mortgage, either expressly or impliedly, or any deduction on account thereof being made from the consideration paid.

" In all the cases where it has been held that the grantee can not question the validity of the mortgage, he has purchased the property on the basis of a clear title, at an agreed price, and has assumed to pay the mortgage debt as a part of the consideration, or the amount of such debt has been deducted from the purchase price of the land on the basis of such clear and complete title."   Crawford v. Nimmons, 180 Ill. 143.

There is no presumption of law contrary to the recitals of the deed from Paul to Morley, that part of the consideration acknowledged to be paid was reserved on account of the incumbrance held by the association (Crawford v. Nimmons, *supra*), and Morley having testified, without contradiction, that nothing was reserved for such purpose, the burden was upon the defendants in error to show otherwise if they could. Morley having testified that after he learned of the existence of the mortgage he had a settlement with Paul, and thereafter made the payments maturing to the association, may mean much or nothing, but it was for the defendants in error to show what was done if they desired to avail of it.

Under the circumstances shown by the record we see no ground for sustaining the contention that the plaintiffs in error are estopped from urging the defense of usury. The fact that Wightman was a party to the usurious contract did not estop him, else the defense of usury could rarely be interposed to a contract that had been in any degree acted upon, and we think we have shown that Morley was not estopped by anything he is shown to have done.

If the parties desire to have the Supreme Court review the case speedily, they may within ten days agree upon the amount due under our view of the case, and we can reverse the decree without remanding the cause and enter judgment here, or give specific directions, from which an appeal can be directly taken.

If not, our order is that the decree be reversed and the cause remanded for further proceedings in conformity herewith.

Reversed and remanded, unless in ten days the parties agree as stated.