## Assets Realization Co. v. Joseph P. Wightman, Jr., et al.

1. CHANCERY PRACTICE—*Power of Trial Court upon Case Being Remanded.*—Under a remanding order the trial court has the power to enter an order re-referring the cause to the master to take further testimony. It also has the power to direct the master to consider all the testimony taken on the original reference, as well as that to be taken upon the re-reference, and to report his conclusions of law and of fact.

2. INTEREST—*Privilege of Exacting a Higher Rate than is Allowed by the General Statute Concerning Interest.*—The privilege of exacting a higher rate than is allowed by the general statute concerning interest is a special privilege which will not be granted, unless the proof affirmatively shows a strict compliance with the terms of the statute by which it is permitted.

3. MASTER—*When His Finding Will Not Be Disturbed.*—Unless the conclusion of the master is clearly against the weight of the evidence, this court can not disturb it.

4. USURY—*Loaning Funds of Building Association Without Complying with the Statute.*—Where a loan from a building association is not obtained by or granted upon competitive bidding according to the terms of the statute, the premium being privately fixed and agreed upon with the secretary of the association, and the total amount paid in premiums and interest for the use of the money loaned exceeds the legal rate of interest, the transaction is usurious.

Bill for Foreclosure.—Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge presiding. Heard in this court at the March term, 1902. Reversed. Opinion filed January 26, 1903.

March 17, 1890, appellee Wrightman made a loan from the Mechanics & Traders' Savings, Loan and Building Association for $2,100 on twenty-one shares of its stock at a premium of twenty per cent, with interest at eight per

cent per annum. The premium was deducted from the loan. He gave his note for $2,100 to evidence this indebtedness, and received but $1,680 in cash. This note provided for payment of the interest and dues on the stock in monthly installments. Upon the maturity of the stock the loan was to be canceled. To secure the payment of this loan one Edgar T. Paul and his wife executed a mortgage upon certain real estate, which Wightman was then about to purchase. The deal between Wightman and Paul was never carried out. Nearly two years after, Paul sold the real estate to appellee Morley for $2,750, without telling him of the existence of this incumbrance, and without deduction therefor. Morley paid to Paul a small amount in cash and gave his notes for the balance of the purchase price. When he made this conveyance Paul intended to pay off the association mortgage, and therefore said nothing to Morley about the incumbrance. Finding himself unable to do so, some two years later he told Morley the facts. This was the first knowledge Morley had of the existence of that incumbrance. The two men settled the matter by the surrender by Paul to Morley of the notes given by the latter on his purchase, and the taking up of the payment of the association loan by Morley, who thereafter made monthly payments, as provided in the loan, for nearly six years.

The association became insolvent, and by the Circuit Court of Cook County on December 22, 1897, was ordered to be wound up, and receivers were appointed. Up to that date there had been paid upon this loan for stock $955.50, and for interest $1,223. July 21, 1899, these receivers filed their bill of foreclosure against appellees, alleging the making and securing of the loan substantially as above stated, and that by reason of the insolvency of the association such loan became due. The bill contains the usual prayer for process and foreclosure.

By their answer Morley and wife set up the conveyance of the premises free from incumbrance from Paul to Morley and from the latter to his wife; that the contract between

the association and Wightman was usurious in this, that the loan was not offered in open meeting to the highest bidder, and that by reason thereof complainants are not entitled to recover either interest or premium on said loan, and all sums paid at any time to the association and to complainants upon this loan should be credited upon the principal indebtedness.

Wightman answers, in substance, as did Morley and wife, claiming also that the premium of $420 deducted by the association from the loan of $2,100 was a fixed minimum premium established by the association, the fixing of which was unlawful and fraudulent; that the funds of the association were never offered at a meeting of the board to the highest bidder, and he never bid a premium of $420 or any other premium; that upon the $2,100 loan he received but $1,680; while the association compelled him to pay eight per cent upon the entire loan, which was usurious and unlawful.

The cause was heard upon the report of the master and a decree of foreclosure was entered finding that there was still due upon the mortgage indebtedness the sum of $1,577.01. Upon appeal to this court the decree was reversed and the cause remanded for further proceedings in conformity with the opinion. Wightman v. Suddard, 93 Ill. App. 142. The cause was redocketed in the Circuit Court and again referred to the master to take further testimony. The master was also directed to consider all the testimony taken on the original reference. In the meantime appellant had purchased the note and mortgage in question and was, on motion, substituted as complainant. Thereupon appellant amended the bill by waiving all right to a deficiency decree, and sought to have the indebtedness satisfied out of the mortgaged property only.

The master's report following this re-reference found, among other things, that there was due from Wightman to the complainant the sum of $18.03. Upon the hearing the chancellor overruled all exceptions and entered a decree confirming the master's report. From that decree this appeal was perfected.

PAM, CALHOUN & GLENNON, attorneys for appellant.

W. A. HAMILTON, attorney for appellees.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

Upon the prior hearing of this case in this court (Wightman v. Suddard, 93 Ill. App. 142) it was found and determined, upon the evidence then before the court, that the loan was usurious, as the statute relating to the method of loaning the funds of the association was not followed; and that Morley, having taken the property by conveyance from Paul, without any agreement, express or implied, to pay the mortgage, or any deduction on account thereof being made from the consideration paid for that conveyance, was not estopped from urging the defense of usury. The decree of the court below was reversed " and the cause remanded for further proceedings in conformity herewith." Under this remanding order the trial court had the power to enter an order re-referring the cause to the master to take further testimony. It also had the power to direct the master to consider all the testimony taken on the original reference, as well as that to be taken upon the re-reference, and to report his conclusions of law and of fact. Aurora & G. Ry. Co. v. Harvey, 178 Ill. 477.

The interest and premium exacted upon this mortgage are usurious, unless they come within the exception contained in the statute relating to loan and building associations. The interest was fixed at eight per cent upon $2,100, the face of the loan, while it is not disputed that the principal sum received by the borrower was but $1,680, the difference of $420 being the premium exacted for the privilege of getting the loan. The statute referred to requires that these associations shall loan their money in open meeting to the highest bidder.

The evidence shows that Paul, at the time he made this loan, also obtained other loans from the association. He went to the secretary of the association and "negotiated" with him as to the premium necessary to be paid to obtain

the loans. These two men, in the office of the secretary, agreed as to the amount of that premium. Paul says :

" The arrangement was made for a premium of twenty per cent, and there were several loans negotiated and concluded on that basis by me. I first made negotiations with Mr. French for a good many loans, and of course dickered on the premium, and we finally concluded it was to be twenty per cent. He said he would get these loans at twenty per cent premium. When I say dickered, I mean negotiated. I mean I was trying to get as low a premium as I could, and he was trying to get as high a premium as he could, and we settled on twenty per cent. It was understood that everything was to be ratified by the directors. I knew it had to be presented to the directors."

This bargain, thus made, the secretary presented to the board of directors of the association in open meeting, and it was by them approved. Paul did not attend such meeting. He never personally bid for the loan, and never in any way bid for it, unless this agreement between him and the secretary can be considered as a bid under the statute. The privilege of exacting a higher rate than is allowed by the general statute concerning interest, is a special privilege which will not be granted unless the proof affirmatively shows a strict compliance with the terms of the statute by which it is permitted.

An examination of the whole evidence brings us to the same conclusion as is reached by the master in his report, where he says :

" There were applications for other loans, made at this particular meeting, and the premium fixed for these loans was also twenty per cent. I find there had been for some time a fixed rate of twenty per cent, and when a borrower applied to the secretary he was given to understand that that was the rate for which money was then selling, and if the borrower accepted the proposed conditions, he made the application and signed it, and it came before the board. That was the manner in which the premium was fixed on the loan in question. And I find the premium was fixed and the application made, with the understanding that the loan would be made at that rate, and that said loan was not obtained as a result of competitive bidding such as is

contemplatéd by the statute, and I find that the loan was usurious."  .

It is not contended that the association ever adopted a by-law fixing the rate of interest and premium, as is provided for in the Homestead Loan Association act as amended by the act of 1889.   As this loan was not obtained by or granted upon competitive bidding, the premium being privately fixed and agreed upon between Paul and the secretary of the association, and as the total amount paid in premium and interest for the use of the money loaned exceeded the legal rate of interest, the transaction is usurious.

We have carefully considered the evidence touching Morley's connection with this mortgage.   He says:

" When I purchased the property of Paul I purchased it for the full sum of $2,750, with no deduction on account of any incumbrance."

A part of this consideration price he paid in cash.   For the remainder he gave his notes.   He did not then know of any incumbrance upon this property, nor did he learn of it until two years later.

" When I found out that this building association mortgage was in existence, I made a settlement with E. T. Paul and took the book he was paying on and have been paying since then.   I did not make any investigation at the time I took his book and began paying these installments as to the loan itself, or as to the means by which it was obtained. I have had no negotiations with the building association directly concerning this loan, except to make my payments every month."

Paul says that Morley paid a certain amount down and gave his notes for the remainder when he purchased the property.   " I don't know that there was anything said to him about it (the mortgage) at the time, but we intended to negotiate his notes and take up the building association mortgage."   When Paul found he could not carry out this scheme, he told Morley of the existence of this mortgage, and said to him that in his, Paul's, judgment, there was money in it for Morley to assume the mortgage; that Mor-

ley said he would look into the matter; that he came again and said he had concluded there was three or four hundred dollars in it for him to assume the mortgage; "so we concluded the deal that way." Paul gave back to Morley all his unpaid notes and turned the association pass-book over to him.

It is evident that the mortgage formed no part of the original consideration for the purchase of the premises. That transaction occurred two years before Morley knew of the existence of the mortgage. Paul purposely kept that knowledge from him and exacted the full consideration price in cash and in notes.

The question remains, under the evidence, did Morley, in his after-negotiations with Paul, assume and agree to pay the mortgage according to its terms; or did he, when he found the premises burdened with an incumbrance, make the best of a bad bargain, by getting back his notes and agreeing to take his chances upon the incumbrance? If the first proposition be proven, then Morley can not plead usury; if the latter be true, then that defense is open to him, and he has availed himself of it.

There is no evidence showing that when Morley took upon himself the burden of making these monthly payments upon the mortgage, he knew of the usury contained therein, nor that any deductions were made to him on account thereof. Nor is there any evidence as to what sum remained unpaid upon the Morley notes; nor does it appear that they understood or agreed as to what sum was then unpaid upon the mortgage notes. In short, the nature and terms of the settlement between Paul and Morley, other than that Morley's notes were surrendered to him and he took up the payment of the monthly dues provided for in the association mortgage, are not found in this record. What Morley did after that settlement was rightfully done, whether considered to have been done under an agreement to assume the mortgage or under an agreement to retain the property subject to the mortgage. The statement of Paul that Morley "assumed the mortgage," is not

evidence, for it is clearly but the opinion of the witness. He testifies as to what was said and done between them, and from that, considered in the light of all the other evidence upon this question, we must determine the nature and extent of the obligations which were incurred by Morley. The testimony upon this phase of the case, as shown by the printed page, is indefinite and unsatisfactory. The master, who saw and heard these witnesses, reported that Morley, by anything which occurred in his settlement with Paul, is not estopped to avail himself of the defense of usury. The learned chancellor approved that report in this regard. Such conclusion is not clearly against the weight of the evidence, and therefore we can not disturb it. Hagemann v. Hagemann, 102 Ill. App. 481.

Upon an accounting, Morley is entitled to have the various amounts which have been paid to the association upon this loan applied in payment of the principal sum received upon the loan, "regardless of whether they were designated payments on stock, interest or premiums." Jamieson v. Jurgens, 195 Ill. 86, 89.

As the amount of these payments exceeds the sum received on the loan, the court below erred in not finding that the loan in question had been paid in full.

The decree of the court below is reversed, and the Circuit Court is directed to enter an order dismissing the bill for want of equity. It is ordered that appellant pay all costs.