### John M. Wagner, Appellee, v. Chicago & Alton Railroad Company, Appellant.

### Gen. No. 18,032.

1. RAILROADS—*when question of contributory negligence of switchman for jury.* Whether plaintiff, a freight conductor, who was crushed between a post and the car on which he was riding, was contributorily negligent, is for the jury where it appears, that he was standing on a step on the side of the car in a customary position to watch the track and to signal the engineer, that it was his duty to keep a lookout, that he was looking for signals when he approached the post and did not know and could not have known of its dangerous proximity, that he saw the post when 100 feet away but it was doubtful whether he could have determined the distance of the post from the track until he got very close to it, and that since it was on the inside of a curve and the car was very long any prudent person might have been deceived.

2. RAILROADS—*duty toward employes of companies using tracks.* Where a railroad company operates trains over the tracks of another at its invitation and pays a consideration therefor, the latter company owes an employe of the former the duty of exercising ordinary care in maintaining the track and its surroundings in a reasonably safe condition.

3. RAILROADS—*liability toward employes of companies using* tracks. A railroad company which owns and operates a track cannot escape liability to an employe of a company which operates trains over such track by contract, when such employe is crushed between a post and the car on which he is riding, on the ground that it did not place the post where it was and had no control over it.

4. RAILROADS—*when manner of construction question for jury.* Where an employe of a railroad company who is on the side of a car, is crushed between a post and the car, the principle that the manner of constructing a railroad is an engineering problem and is not a question to be submitted to the jury is not applicable.

5. RAILROADS—*when freight conductor employed in interstate commerce.* A conductor of freight trains while assisting in transferring cars from one yard to another under orders, which cars are then being used in interstate commerce, is employed in interstate commerce within the Federal Employers' Liability Act.

6. FEDERAL EMPLOYERS' LIABILITY ACT—*when benefits paid to employe may be set off under section 5.* If a conductor of freight trains who is engaged in interstate commerce is injured by the negligence of his employer, the employer may, under the Federal Employers' Liability Act, § 5, set off in an action for such injuries any sum it has contributed to any relief benefit that may have been paid to such conductor.

7. FEDERAL EMPLOYERS' LIABILITY ACT—*when payment of benefits to employe does not release liability.* Under the Federal Employers' Liability Act, § 5, acceptance of benefits from a relief department of a railroad company by an employe injured by such company's negligence does not release it from liability, though the employe has so agreed.

8. RAILROADS—*when action against company owning tracks where accident occurred not barred under Federal Employers' Liability Act, section 5.* Where an employe of a railroad company, which operates trains over tracks owned by another company, is injured because of the dangerous proximity of a post to the track, such employe's right of action against the owner company is not under the Federal Employers' Liability Act, § 5, barred, though he accepts benefits from the relief department of the employer company.

9. RAILROADS—*set off for benefits paid under Federal Employers' Liability Act, section 5.* Under the Federal Employers' Liability Act, § 5, where an employe of a railroad company which operates trains over tracks owned by another company is injured because of the dangerous proximity of a post to the track and accepts benefits from the relief department of the employer company, part of which is contributed by such employer company, the owner company is entitled to set off in an action for the injuries, the proportionate

share of the benefits received by the employe which was contributed by the employer company.

10. DAMAGES—*when not excessive.* A verdict for $15,000 is not excessive where plaintiff was in a hospital for 9½ months, was confined to his home for 2½ months, sustained a fracture of the pelvis which left one side ¾ of an inch higher than the other, a hole was torn in his bladder, he became neurasthenic, and there was evidence that his sexual power was impaired.

11. RAILROADS—*instruction as to credit for benefits paid employe under Federal Employers' Liability Act.* Where an employe of a railroad company brings action for injuries against the company which owns the tracks where the accident occurred, it is error to instruct that if the company is found guilty credit should not be given such company in assessing damages for any sum which the relief department of the employer company paid, since the jury might thereunder take the view either that no credit should be given for the sum paid, or that no credit should be given for the proportion thereof contributed by the employer company; but the error may be cured by remittitur.

Appeal from the Superior Court of Cook county; the Hon. JOHN McNUTT, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1911. Affirmed on remittitur. Opinion filed May 8, 1913. Rehearing denied May 22, 1913.

**Statement by the Court.** This is an appeal from a judgment for $15,000, entered in the Superior Court of Cook county, June 3, 1911, upon the verdict of a jury, in favor of appellee, hereinafter called plaintiff, in an action for damages for personal injuries brought against appellant, hereinafter called defendant. Plaintiff was employed by the Chicago, Burlington & Quincy Railroad Company, hereinafter called the C. B. & Q., as a conductor or switchman of freight trains. At the time of the accident, which occurred December 15, 1908, he was engaged in moving a train consisting of five baggage cars loaded with silk. He was caught and crushed between the side of one of said cars and a semaphore post, or pole, standing in close proximity to the track, and suffered severe and permanent injuries. Defendant is sued as the owner of the track on which the train was moving.

Plaintiff's original declaration, filed August 20, 1909,

consisted of one count and charged, substantially, that on December 15, 1908, defendant owned and operated the track in question and was a common carrier engaged in interstate commerce; that the C. B. & Q. owned a certain railroad and was also engaged in interstate commerce; that plaintiff was employed in interstate commerce as a switchman by the C. B. & Q.; that the C. B. & Q. was operating the train in question, upon which plaintiff was employed as switchman, over said track at the invitation and with the knowledge and consent of defendant and for a valuable consideration; that defendant, long prior to the time in question, "negligently caused or permitted" the semaphore pole to be placed alongside of and so close to said track that it was liable to crush switchmen against or knock them from the sides of cars while being operated upon the track past the pole; that defendant "negligently permitted" the post to "remain" in said position from thence until the time of plaintiff's injuries, whereby switchmen employed upon trains operated over the track were exposed to great danger; that all of which facts the defendant and the C. B. & Q. knew, or should have known, in time to have said conditions remedied; that plaintiff, through no want of ordinary care upon his part, did not know of these conditions or the danger incident thereto; that defendant and C. B. & Q. also knew, or should have known, that plaintiff was so employed upon the train and of his lack of knowledge of the position of the post and the danger, in sufficient time prior to the accident "to have notified or informed" plaintiff of said position of the post and said danger, but that each of them negligently failed so to do; and that, while plaintiff was in the discharge of his duty as switchman and riding upon the side of one of the cars of the train, and while the train was being operated upon said track past said post, and while plaintiff was exercising ordinary care for his own safety, plain-

tiff was caught and crushed between the post and the side of the car, as a direct result of the dangerous proximity of the post to the track and of his being uninformed of that fact, and was thereby injured, etc. To this declaration the defendant filed the general issue, and a special plea denying ownership or control of the said track, train or semaphore post, and denying that defendant had invited the C. B. & Q. to operate engines and cars upon said track. On May 10, 1911, plaintiff by leave of court filed two additional counts, containing practically the same allegations as those in the original count but omitting all reference to interstate commerce. To these additional counts the defendant filed the general issue, a special plea denying ownership, operation or control of the track, train or semaphore post, and a plea of the Statute of Limitations. Plaintiff demurred to the last mentioned plea and on May 15, 1911, the demurrer was sustained and defendant excepted. The trial was commenced on the same day, and on May 22nd the jury returned a verdict for plaintiff for $15,000, and special findings upon questions submitted to them by the court, as follows:

"Do you find from the evidence that upon December 15, 1908, the Chicago, Burlington and Quincy Railroad Company was engaged in interstate commerce between two or more states, and that plaintiff was injured while employed by it in such commerce?"

Answer "Yes."

The material facts as disclosed from the evidence are substantially as follows: The track in question was located in the city of Chicago and was owned by the defendant. It was a curved track, about 250 feet long, known as the "Fort Wayne 'Y'," and connected the Pennsylvania railroad (Fort Wayne branch) with the Chicago & Western Indiana railroad, hereinafter called the C. & W. I., and was part of the "Grove street tracks." A section foreman and his crew, employed by defendant, made all the repairs on the track

Wagner v. Chicago & Alton R. Co., 180 Ill. App. 196.

for a period of 12 years, and a switchman employed by defendant made a record of the numbers and initials of all engines and cars passing over the track. In January, 1909, the C. B. & Q. received a bill from defendant for "trackage on 2 engines and 5 cars passing over Grove street during the month of December, 1908," which bill was certified to by an employe of the C. B. & Q. as being correct, and the defendant received the amount of the bill. The semaphore post had been in the same position as on the day of the accident for a period of at least 12 years. It had been put in and was being operated and maintained by the C. & W. I. and was part of the interlocking system of the C. & W. I. It was not used to control the "Y" track on which the train was at the time of the accident, but it was within the segment of the circle formed by the curved "Y" track and the straight track on the opposite side of the post. A witness for plaintiff testified that in August, 1909, after the accident, he took photographs of the tracks, etc., and made measurements of the distance between the semaphore post and the nearest rail of the tracks on either side of the post; that the distance between the nearest edge of the post and the nearest rail of the "Y" track was 4 feet 3 inches; that the distance between the nearest edge of the post and the nearest rail of the track on the other side was 4 feet 11 inches; that the distance at the post between the nearest rails of the two tracks was 10 feet, and at a point five feet north or northeast of the post the distance between the nearest rails of the two tracks was 10 feet 11 inches, that at ten feet the distance was 11 feet 6 inches, that at fifteen feet the distance was 12 feet 2 inches, that at twenty feet the distance was 13 feet, and at thirty feet the distance was 13 feet 6 inches; that the distance from the post south to the frog, where the east rail of the "Y" track came into conjunction with the west rail of the other track above mentioned, was 43 feet. A witness for defendant, employed as a civil engineer by

defendant, testified that a day or two previous he measured the distance between the post and the nearest rail of the "Y" track, and that, allowing for the "overhang" of an ordinary baggage car, which would be 2 feet 9 inches when the *end* of the car was directly opposite the post, the "clearance" between the post and such car is 2 feet 3 inches. This clearance and overhang, as stated by this witness, added together makes the distance between the nearest rail of the "Y" track and the post 5 feet, or 9 inches greater than the distance as given by plaintiff's witness. Defendant's witness also testified that the distance from the post south to said frog was 53 feet, or 10 feet greater than the distance as given by plaintiff's witness. To account for these discrepancies, a witness for plaintiff in rebuttal testified that during the last week in October, 1910, by direction of the signal engineer of the C. & W. I., he moved the semaphore post "north or very near north" about 6 feet. Two witnesses for plaintiff testified that after the accident the train moved about a car length or two before it was stopped, and that when it stopped there was a clearance of from 8 to 10 inches between the post and the middle of one of the baggage cars standing opposite it, and plaintiff testified that the clearance between the post and the car he was riding on was "about 6 inches or so—close enough to crush me."

Plaintiff was 35 years of age and unmarried. He had worked for the C. B. & Q. for about 20 years, as number taker, car sealer, car carder, switchman, time-keeper on track elevation, and as conductor of freight trains. He was the conductor in charge of the train at the time of the accident, giving all necessary directions to the engineer. His average earnings as conductor were $110 per month. His general work consisted in going from one yard to another with a "roustabout" engine, handling cars loaded with "through stuff" going by different roads to New York

and other points outside of Chicago, most of the cars having been originally shipped from western and northwestern states.   About 7 o'clock on the morning of the accident he first saw three of the five baggage cars standing in the 14th street passenger yard as part of the St. Paul & Minneapolis train that came from Minneapolis.   About 9 o'clock he first saw the two other baggage cars going down to the depot as part of another St. Paul & Minneapolis train.   These five cars were "Great Northern" baggage cars, having customs seals on them and containing bales of silk, which had been shipped from Seattle, Washington, the port of entry, and were marked as to destination "New York City."   Plaintiff testified that he coupled the five baggage cars together, that he received an order by telephone from some clerk in the superintendent's office of the C. B. & Q. to take the cars over to the Erie railroad at the 51st street yard as quickly as possible, that he told the clerk that the quickest way was over the "Fort Wayne," that the clerk said, "Take them that way," and that the train left Harrison street about 10:45 A. M., and was on its way to the Erie road when the accident happened.   The train was moving in a northeasterly direction around the curved track, the post being inside of the curve, at a speed variously estimated at from 4 to 10 miles per hour.   The engine was in the rear pushing the cars.   The front baggage car had two doors on the side nearest the post as it passed the post.   It also had a "blind" door at its front end but no platform at that end to stand upon.   Coleman, a switchman, was at the front end of the front car, standing on a grab-iron with his arm through the brake wheel, for the purpose of watching for signals or conditions requiring the train to be stopped.   He could not give any hand signals; the only thing he could do was to signal the engineer, by means of an "air gun" which he was holding, to stop the train. Plaintiff was riding on the side of the front car nearest

the post, looking north in the direction the train was moving. He was standing on a "ladder step" made of iron, which ran the full width of the foremost of the two doors on the side of the car underneath the door sill. He was about 15 feet from the front end of the car, which was about 65 feet in length, opposite said door, and was holding on to the two grab-irons located on either side of the door. The door was not flush with the side of the car; it "came in 4 or 5 inches." Plaintiff testified that the door sill was about even with the bottom line of his vest, that there is no fixed rule as to where on a freight train a conductor should ride, but that he makes a choice in view of the nature of the work; that in this case it was his business to look out for obstructions and for signals ahead in order to notify the engineer as to the movements of the train; that as the train approached the post he was looking in its direction watching for signals; that he saw the post when he was about 100 feet from it; that as he approached it he "judged there was plenty of room for my body to pass in between the car and the post;" that when the post was about 6 feet away "I began to squeeze in my body * * * to be on the safe side," and even then "it looked to me as if there was plenty of clearance;" that he had never gone over that track before and that he did not know before the accident that there was not clearance enough, no one having told him of the close proximity of the post to the track; that if he had known he was going to be brushed off he certainly would have jumped off the train, as he was accustomed to get off trains moving slowly; that at the time he was passing the post he "was right tight close against the car;" that his head and shoulders were "in the doorway of the car;" that his body was crushed between the door sill of the car and the post, and that he fell to the ground and was picked up "about 10 feet or so northeast of the post." The engineer of the train testified that at the time of the accident he was looking right along

Wagner v. Chicago & Alton R. Co., 180 Ill. App. 196.

the line making observations, watching the men and
the movement of the train; that "it appeared as if
plaintiff had room enough to go in between the sema-
phore and the car;" that the semaphore caught plain-
tiff at the hips and the abdomen and he fell to the
ground on the north side of the semaphore; that he
(engineer) stopped the train immediately and went
to where plaintiff was, and that he was conscious when
"we picked him up."

Plaintiff was in a hospital for about 9½ months, be-
ing confined to his bed about 6 months. After leaving the
hospital he went to his home where he remained for
2½ months. He then went to Denver and southern
California, on the advice of his physician, returning
to Chicago after a lapse of 5½ months. At the time
of the accident he suffered a fracture of the pelvis,
and it grew together in such a way that at the time
of the trial the left side was ¾ of an inch higher than
the right, giving him a "kind of wabbling gait," which
is a permanent condition. A hole was torn in his
bladder, and while at the time of the last examination
it was "performing pretty well its usual functions,"
there was still evidence of bladder catarrh. While in
the hospital he was operated upon twice. He became
very neurasthenic. There was also evidence of im-
pairment of sexual power. He testified at the trial
that he still could not walk 7 or 8 blocks without be-
coming exhausted and dizzy. Certain physicians tes-
tified that he can do work not requiring strength or
standing for long periods of time. At the time of the
trial he had earned no money since the accident.

When plaintiff had offered and introduced certain
evidence, during the making of his case in chief, as
to the contents and destination of the baggage cars,
defendant objected on the ground that there had been
an agreement between counsel, whereby defendant's
attorney had agreed that the court might sustain
plaintiff's demurrer to defendant's plea of the Statute
of Limitations to plaintiff's additional counts, in con-

sideration of plaintiff's attorney agreeing that "the question of interstate commerce and the Federal Employers' Liability Act" should be kept out of the case. What the terms of the agreement, if any, were, does not appear in the record, but the trial judge stated that he had an impression that some such agreement had been made, but was not going to decide that it had been made. Plaintiff's attorney stated that in his opinion the question was probably not in the case, but if it was in the case and might prove beneficial to his client he desired to prove the facts, and further stated, inasmuch as the original declaration, but not the additional counts, alleged that the defendant and the C. B. & Q. were engaged in interstate commerce and that the plaintiff was employed in interstate commerce, that if the evidence objected to was excluded it might furnish a basis for defendant to claim that those allegations in the original declaration had not been proved. Defendant's attorney stated that he would agree that lack of proof as to those allegations would not constitute a variance, whereupon the court, with the consent of plaintiff's attorney, instructed the jury that "everything that has been said by the witness in relation to the contents of the car, how it was stamped and how marked is excluded from your consideration."

During the introduction of evidence on behalf of defendant, it was shown that plaintiff had been a member of the "Relief Department" of the C. B. & Q. since 1902; that this was an organization, of which the C. B. & Q. had general charge, created for the purpose of establishing a relief fund; that it was not a separate corporation but only a department of the C. B. & Q.; that the department was in the executive charge of a superintendent; that many of the employes of the C. B. & Q. *Railroad* and the C. B. & Q. *Railway* were members of the department; that these employes made monthly contributions for the creation of the relief fund from which sick, injury and death benefits

were to be paid; that the C. B. & Q. furnished to the department without charge all necessary floor space, telegraph, telephone and transportation service and the facilities of all its other departments; that no part of the contributions of members was used to pay the operating expenses of the department; that the contributions of members were made by deductions from the pay-rolls; that the C. B. & Q. contributed, without reimbursement, to cover said operating expenses, during the year 1908 about $81,000, during 1909 about $78,000, and during 1910 about $85,000; that the contributions of members amounted in 1908 to about $500,000, in 1909 to about $540,000, and in 1910 to about $585,000; that members were divided into different classes depending upon the amount of their contributions; that plaintiff first made application for membership in the first class, but that in 1903 he changed his membership to the fourth class; that plaintiff thereafter contributed $3 each month, the amount being deducted from his monthly wages; that members of the fourth class, in case of disability, were entitled as benefits to the sum of $2 per day for a period not longer than 52 weeks and at half that rate thereafter during the continuance of the disability, and that bills for necessary surgical treatment were also to be paid; that disability meant "physical inability to work by reason of sickness or accidental injury;" that plaintiff in this application agreed to be bound by the regulations of the Relief Department, and further agreed that, "in consideration of the amounts paid and to be paid by said Company for the maintenance of said Relief Department, and of the guarantee by said Company of the payment of said benefits, the *acceptance* by me of benefits for injury shall operate as a release and satisfaction of all claims against said Company, and all other companies associated therewith in the administration of their Relief Departments, for damages arising from or growing out of said injury; * * * and further, if any suit

shall be brought against said Company * .* * for damages arising from or growing out of injury or death occurring to me, the benefits otherwise payable, and all obligations of said Relief Department, and of said Company, created by my membership in said Relief Fund, shall thereupon be forfeited without any declaration or other act by said Relief Department or said Company;" that plaintiff acknowledged in writing the receipt of certificate of membership, April 28, 1903, together with copy of the regulations; that plaintiff up to the time of the trial had received from said relief department the total sum of $1,231, for benefits, that this amount was paid to him in 29 checks, varying in amounts from $28 to $62, all being dated prior to May 3, 1911, that the last check was for period ending April 30, 1911, that the first check was dated January 5, 1909, but was not cashed by plaintiff until June 9, 1909; and that, in addition to this total sum for benefits, the relief department also paid out, on behalf of plaintiff, the sum of $1,349.59 for hospital bills, physician's services, etc.

At the commencement of the introduction of evidence on behalf of plaintiff in rebuttal, the attorney for plaintiff stated, out of the jury's hearing:

"I want to prove that interstate feature; * * * under my agreement with counsel and the court, I do not seek to *recover* in this case by virtue of the Employer's Liability Law; * * * but here, as a matter of defense, they introduce what they claim amounts to a release between this man and his employer. Now, *as meeting that defense,* and for the purpose of showing that it is invalid and that what they claim as a release is not binding but is illegal, I want to show this: That at the time this man was injured he was engaged in interstate commerce, the point of that being that the Employer's Liability Law states that a release, or anything of that kind, is invalid as between the employer and an employe, who is injured while engaged in interstate commerce, the purpose being that if this release is invalid as between this man and his em-

ployer, it surely is not valid as to somebody else  *  *  *
I am not claiming the right of action under this Employer's Liability Law, but  *  *  *  under the common law liability. As a defense, they bring in this release. If, for any reason, we can show that release is invalid, I think it proper in rebuttal to show it, and it is invalid if this man was injured while engaged in interstate commerce at the time of the accident.''

The attorney for defendant strenuously objected to any proof that, at the time plaintiff was injured, he was engaged in interstate commerce, and for the reason that plaintiff's attorney had several times stated that that feature was out of the case, and had agreed that no such evidence would be introduced, in consideration of defendant's attorney agreeing that the court might sustain plaintiff's demurrer to defendant's plea of the Statute of Limitations to plaintiff's additional counts; but the court overruled defendant's objection to such proof and defendant excepted. Defendant then moved that a juror be withdrawn and the case continued and defendant be permitted to argue the demurrer to its said plea of the Statute of Limitations. The motion was denied and defendant excepted. The court then permitted plaintiff to reintroduce the evidence (previously introduced during plaintiff's case in chief and stricken from the record), and other evidence, showing that at the time of the accident plaintiff and the C. B. & Q. were engaged in interstate commerce.

It was admitted during the trial that plaintiff is also the plaintiff in a case, pending in the Circuit Court of Cook county, wherein the C. B. & Q., the C. & W. I., the Illinois Central Railroad and the Atchison, Topeka & Santa Fe Railroad are defendants. The files in the case were introduced in evidence, from which it appeared that in said Circuit Court action plaintiff sought to recover damages for the same injuries as were charged in the present case as having been received.

WINSTON, PAYNE, STRAWN & SHAW, for appellant; SILAS H. STRAWN, EDWARD W. EVERETT and J. SIDNEY CONDIT, of counsel.

JAMES C. McSHANE, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

First, It is contended by counsel for defendant that plaintiff was guilty of contributory negligence, which precludes his recovery. Plaintiff was required to exercise that degree of care for his own safety that an ordinarily prudent person would exercise under the same or similar circumstances. Counsel urge that plaintiff was not exercising ordinary care in riding on the side of the car, standing on the ladder step underneath the door sill, and that he could have ridden on the engine or upon some other part of the train. The engine was in the rear of the train, pushing the five baggage cars around this curved track and towards a net-work of other tracks, where there were many switches and signals. Although the switches were being operated by towermen, plaintiff did not know upon what track his train would be run after leaving the curved track. He was the conductor in charge of the train, and it appears from the evidence that it was his duty to keep a lookout ahead to see where the train was going and to ascertain whether the signals were set for or against his train, and be in a position where he could signal the engineer to stop or go ahead, that neither he nor the engineer had gone over the curved track before, and that as he approached the post he was "looking ahead for signals." Because of the construction of the front end of the front baggage car, where Coleman was riding, plaintiff could not ride there and at the same time be in a position to be seen by the engineer and be able to signal the engineer. All that Coleman could do was to signal the engineer by

means of his "air gun" to *stop* the train; he could neither see nor be seen by the engineer. Plaintiff, when the train started to move around the curved track, probably decided to ride in the position he did because, under the circumstances, it seemed to him to be the most available place to keep a lookout ahead and at the same time be able to quickly signal the engineer. And, in our opinion, except for the dangerous proximity of the post to the track, it was as safe for an experienced switchman as any other place in the forward part of the train. It does not appear that he knew or could have known of the dangerous proximity of the post at the time he took his position. Furthermore, the testimony shows that it was customary for switchmen to ride in that position. Under the facts of this case we cannot say, as a matter of law, that plaintiff was guilty of negligence in taking the position he did upon the train. But counsel further urge that plaintiff had actual knowledge of the presence of the post for a sufficient length of time before his injury to have avoided the accident, and argue that, as he saw the post when 100 feet away from it and continuously as he approached it, he should have discovered its dangerous proximity to the track and jumped from the moving train before reaching the post, and that he was guilty of contributory negligence in not making that discovery and so jumping. It is at least doubtful if he could have determined the distance of the post from the track until he got very close to it. The post was on the inside of the curved track and there was no car opposite the post until the car upon which he was riding reached the post. If it had been a foot further away from the track he probably would not have been injured. Owing to the length of the car and the curve of the track, the forward end of the car, when even with the post, probably did not overhang the rail much, if any, but when that part of the car upon which plaintiff was riding had reached the post the "overhang" was probably considerable. Any prudent person might

easily be deceived under such conditions, and we cannot say, as a matter of law, that plaintiff was guilty of negligence in not jumping from the train. It was for the jury to say, under all the facts and circumstances of this case, whether or not plaintiff was guilty of negligence, and it is evident from their verdict that they did not think so. *North Chicago St. R. Co. v. Dudgeon,* 184 Ill. 477, 486; *Illinois Terminal R. Co. v. Thompson,* 210 Ill. 226, 235; *Chicago & A. R. Co. v. Stevens,* 189 Ill. 226; *Chicago & A. R. Co. v. Johnson,* 116 Ill. 206; *Whalen v. Illinois & St. L. Railroad & Coal Co.,* 16 Ill. App. 320; *Texas & P. R. Co. v. Swearingen,* 196 U. S. 51; *Indianapolis Traction & Terminal Co. v. Holtsclaw,* 41 Ind. App. 520; *Johnston v. Oregon S. L. & U. N. Ry. Co.,* 23 Ore. 94, 105. And we cannot say that their verdict is manifestly against the weight of the evidence.

Second. It is also contended that the evidence fails to prove that defendant was guilty of any negligence which was the proximate cause of the injury. Defendant by special plea denied the ownership or control of the curved track and also denied that the C., B. & Q. had been invited by defendant to operate its engines and cars upon the track. We think that the evidence shows that defendant owned, possessed and operated the curved track, and that the C., B. & Q. operated the train in question over said track at the invitation of defendant and for a valuable consideration. Plaintiff's presence upon the track was therefore contracted for, and we think that defendant owed him the duty of exercising ordinary care in maintaining the track and its surroundings in a reasonably safe condition for the purpose for which it was provided and used. "A railroad company owning a railroad which permits another company to use the road is liable for injuries to persons on the trains of the latter due to the defective condition of the roadbed, track, or bridges, or to the defective condition or negligent management of its switches, although the injured persons were employes

of the latter company." 33 Cyc. 711; *Chicago Terminal Transfer R. Co. v. Vandenberg*, 164 Ind. 470. And we think that the evidence shows that the curved track and the semaphore post were in such dangerous proximity to each other as to warrant the jury in finding the defendant guilty of negligence in that regard. *South Side El. R. Co. v. Nesvig*, 214 Ill. 463; *Illinois Terminal R. Co. v. Thompson*, 210 Ill. 226; *Chicago & I. R. Co. v. Russell*, 91 Ill. 298; *Illinois Cent. R. Co. v. Welch*, 52 Ill. 183; *Chicago, B. & Q. R. Co. v. Gregory*, 58 Ill. 272. But counsel for defendant argue that the semaphore post was owned, operated and maintained by the C. & W. I., and was a part of the interlocking system of that company, that defendant did not place the post where it was and had no control over it, and, therefore, defendant was not guilty of negligence because of the dangerous proximity of the post to the track. We cannot agree with counsel's conclusion. "It is not essential to the liability of the company in case an injury is occasioned by some object or structure on premises adjoining the right of way, that the company should have itself placed or participated in placing the object or structure on the adjoining premises. If the company has notice of the existence of any such object or structure, or if notice may be presumed from length of time since the object was placed thereon, or if the company is otherwise chargeable with notice, it is negligence on the part of the company to continue to operate its trains in such dangerous proximity to such objects or structures." *South Side El. R. Co. v. Nesvig*, 214 Ill. 463, 470; *Illinois Terminal R. Co. v. Thompson*, 210 Ill. 226, 231.

Third. It is further contended that, inasmuch as "the manner of constructing a railroad is an engineering question * * * and * * * not a question for a court to submit to a jury" (*Chicago & E. I. R. Co. v. Driscoll*, 176 Ill. 330, 334), the trial court erred in allowing the case to go to the jury. We do not think that the principle invoked is applicable to the present

case. In several of the earlier Illinois cases, where the poles or other obstructions were placed by the companies upon their own right of way, no suggestion appears to have been made that the companies were not liable upon the ground that the placing of the same involved an engineering problem. In the case of *Chicago & A. Ry. Co. v. Howell,* 109 Ill. App. 546, affirmed 208 Ill. 155, it is said (p. 549):

"Whatever may be the proper application of this view of the law in this state, and to whatever length it may have been extended and applied elsewhere, our courts have not recognized it as applicable to structures of any kind erected or maintained in connection with the operation of the road, such as a 'mail-catcher,' telegraph pole, coal shed, flag station, awning post, coal shute, scale-house, switch-stand, or other structure." See also *Chicago W. & V. Coal Co. v. Brooks,* 138 Ill. App. 34, 39, affirmed 234 Ill. 372; *Texas & P. Ry. Co. v. Swearingen,* 196 U. S. 51, 61.

In the case of *Illinois Terminal R. Co. v. Thompson,* 112 Ill. App. 463, affirmed 210 Ill. 226, where the railroad company had not erected the pole in question, it is said (p. 470): "We have seen no decision that telegraph poles along the track or in the yards, and their proximity to passing trains, may be regarded as part of the railroad construction not to be considered under a charge of negligence." We cannot agree with counsel's contention that the court erred in refusing to instruct the jury at the close of all the evidence to find for the defendant upon this theory.

Fourth. It is further contended by counsel for defendant that, under the authority of the case of *Eckman v. Chicago, B. & Q. R. Co.,* 169 Ill. 312, plaintiff's acceptance of benefits from the Relief Department of the C., B. & Q. released *that company* from liability to pay damages because of plaintiff's injuries; that if defendant was guilty of negligence causing plaintiff's injuries, the C., B. & Q. was also guilty of negligence contributing to plaintiff's injuries, in that it failed to use reasonable care to furnish plaintiff, its employe, a rea-

sonably safe place to work, and failed to warn him of
the dangerous proximity of the post to the track when
it sent him in charge of its train over the track, and
that the C., B. & Q. is also liable for said injuries as
lessee or licensee of said track; that the C., B. & Q.
and defendant were joint tort feasors, and that the re-
lease of one of them is a release of the other and that
an accord and satisfaction with one of them is a bar
to an action against the other; that even though it was
not proved that the C., B. & Q. and defendant were
joint tort feasors it is sufficient if both were liable for
plaintiff's injuries; that one sustaining a bodily injury
by the negligence of one or more persons can have but
one satisfaction therefor, and that inasmuch as plain-
tiff accepted a satisfaction from the C., B. & Q., he
cannot recover anything from the defendant.

To these contentions counsel for plaintiff replies,
(1) that plaintiff's acceptance of benefits from the C.,
B. & Q. Relief Department was not, because of the Fed-
eral Employer's Liability Act, a valid release of the
C., B. & Q., and hence it could not operate as a release
to defendant, and (2) assuming the alleged release to
the C., B. & Q. to be valid, plaintiff's acceptance of
benefits did not release defendant.

Section 1 of the Federal Act referred to, approved
April 22, 1908 (35 U. S. Stat. at Large, part 1, p. 65),
provides:

"That every common carrier by railroad while en-
gaging in commerce between any of the several States
or Territories, or between any of the States and Ter-
ritories,   *   *   *   or between   *   *   *   any of the
States or Territories and any foreign nation or na-
tions, shall be liable in damages to any person suffer-
ing injury while he is employed by such carrier in such
commerce,   *   *   *   for such injury   *   *   *   result-
ing in whole or in part from the negligence of any of
the officers, agents, or employes of such carrier, or by
reason of any defect or insufficiency, due to its negli-
gence, in its cars, engines, appliances, machinery,

track, roadbed, works, boats, wharves, or other equipment.''

Section 5 of the Act provides:

''That any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this Act, shall to that extent be void: *Provided,* That in any action brought against any such common carrier under or by virtue of any of the provisions of this Act, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employe or the person entitled thereto on account of the injury or death for which said action was brought.''

We think that the evidence in this case shows that at the time of the accident, when the C., B. & Q. was moving the baggage cars in question over the curved track, that company was a common carrier engaged in interstate commerce. ''Every part of every transportation of articles of commerce in a continuous passage from an inception in one state to a prescribed destination in another is a transaction of interstate commerce.'' *U. S. v. Colorado & N. W. R. Co.,* 85 C. C. A. 27; *U. S. v. Southern Ry. Co.,* 187 Fed. Rep. 209. And we think that under the facts of this case plaintiff, while assisting in the moving of the cars at the time of the accident, was employed in interstate commerce within the meaning of the Federal Employer's Liability Act. *Behrens v. Illinois Cent. R. Co.,* 192 Fed. Rep. 581; *Johnson v. Great Northern R. Co.,* 102 C. C. A. 89. And we are of the opinion that, because of the provisions of said Federal Act, plaintiff's acceptance of benefits from the C., B. & Q. Relief Department, as disclosed by the evidence in this case, did not release the C., B. & Q. from liability for plaintiff's personal injuries occasioned by its negligence, in support of which opinion we cite without discussion the following cases: *Philadelphia, B. & W. R. Co. v. Schubert,* 36 App. Cas. (D. C.) 565, affirmed 224 U. S. 603; *Mc-*

*Namara v. Washington Terminal Co.*, 35 App. Cas. (D. C.) 230; *Barden v. Atlantic C. L. R. Co.*, 152 N. C. 318; *Washington v. Atlantic C. L. R. Co.*, 136 Ga. 638. Had the plaintiff in this case brought his action against the C., B. & Q., then under the proviso of Section 5 of the Federal Act the C., B. & Q. could have "set off therein any sum *it had contributed or paid* to any * * * relief benefit * * * that may have been paid" to plaintiff. We think it follows that, in the present action where plaintiff seeks to recover damages from the defendant, the alleged release or satisfaction should not be given any greater effect against the defendant than it would have had in an action against the C., B. & Q. And our conclusion is that the fact that plaintiff accepted benefits, in the manner and in the amounts as shown by the evidence, from the Relief Department of the C., B. & Q. is not a bar to plaintiff's right to recover damages from the defendant in this action for the injuries sustained by him.

But counsel for defendant contend that plaintiff should not be permitted to avail himself of the provisions of the Federal Act because of the alleged agreement claimed to have been made between opposing counsel, at the time the court sustained plaintiff's demurrer to defendant's plea of the Statute of Limitations, to the effect that the Federal Act should be kept out of the case. We cannot agree with the contention. If any agreement was made, the terms thereof are not set out in the transcript before us. From the record it appears that on May 15, 1911, the cause came on to be heard upon the demurrer to defendant's plea of the Statute of Limitations, etc., and "after argument of counsel and due deliberation by the court, said demurrer is sustained, to which the defendant excepts." We think that under all the facts and circumstances disclosed by the record the trial court did not err in permitting plaintiff in rebuttal to introduce evidence showing that at the time of the accident the C., B. & Q.

was engaged and plaintiff was employed in interstate commerce.

Because of the views above expressed it is unnecessary for us to discuss the additional contention of counsel for plaintiff, viz.: assuming that the alleged release to the C., B. & Q. to be a valid one, nevertheless plaintiff's acceptance of benefits from the Relief Department of the C., B. & Q. did not release defendant.

Fifth. It is further contended by counsel for defendant that the trial court erred in its rulings in admitting and in refusing to admit certain evidence offered. We deem it unnecessary to discuss the several points made. Suffice it to say that we have considered all of them and are of the opinion that no error prejudicial to the defendant was committed as urged by counsel. Complaint is also made of certain remarks of plaintiff's counsel made during the trial and during his argument to the jury. We cannot say that these remarks were so improper as to warrant a reversal of the judgment. Nor do we think that the verdict of the jury is excessive and the result of passion and prejudice, as counsel contend.

Sixth. It is further contended that the court erred in giving and refusing to give certain instructions. As to the refused instructions we do not think that any error was committed. Plaintiff's given instruction, No. 1, which is admitted to be a correct statement of law, was not in our opinion misleading, as defendant's counsel contend. Plaintiff's given instruction, No. 9, told the jury that, if they found defendant guilty and that plaintiff was entitled to damages, then in the assessment of such damages they "should not credit the defendant with any sum which the Chicago, Burlington & Quincy Railroad Relief Department paid to the plaintiff, or paid to any doctor, or other person, for or on account of the plaintiff." It appears from the evidence that the Relief Department of the C., B. & Q. paid plaintiff, as benefits, the sum of $1,231, and also expended on plaintiff's behalf the additional sum of

$1,349.59, for hospital bills, physician's services, etc., or a total of $2,580.59. It further appears that during the years 1908, 1909 and 1910, the C., B. & Q. contributed each year to the Department not to exceed fifteen per cent. of the entire annual receipts of the Department, the remainder of which receipts being contributed by members or employes. In view of these facts the instruction was not strictly accurate. If it was intended that the jury be instructed that neither the said sum of $1,231 nor the said sum of $1,349.59 be allowed as a credit to the defendant, we think it was correct. But if it was intended to instruct the jury that the defendant should not be credited with any part of said sums, to-wit: the proportionate part thereof contributed by the C., B. & Q., then the instruction was wrong, and for the reason that the C., B. & Q. being entitled to have set off the amount contributed by it as against any claim for damages brought by the plaintiff against it, the defendant is also entitled to the same credit in a suit brought against it for the same injury. Either view might have been taken by the jury, and the instruction, therefore, was calculated to mislead them. This error, however, can be cured by a remittitur. Fifteen per cent. of $2,580.59 amounts to $387.09. If, therefore, plaintiff within ten days shall file a remittitur of $387.09, the judgment will be affirmed for $14,612.91; otherwise it will be reversed and the cause remanded.

*Affirmed on remittitur; otherwise reversed and remanded.*